**LOCAL 295/LOCAL 851 IBT EMPLOYER GROUP PENSION TRUST AND WELFARE FUND, et al., Plaintiffs,**

v.

**FIFTH THIRD BANCORP. et al., Defendants**

**Case No. 1:08–cv–421.**

United States District Court, S.D. Ohio, Western Division.

Aug. 10, 2010.

---

Barbara A. Podell, Eric Lechtzin, Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, PA, Donald John Rafferty, Michael Richard Schmidt, Cohen Todd Kite & Stanford, William Kendall Flynn, Strauss & Troy, Phyllis Elaine Brown, Law Offices of Phyllis Brown, Lynn D.

Pundzak, Cincinnati, OH, Robert B. Weintraub, Wolf Haldenstein Adler Freeman & Herz, New York, NY, Douglas S. Wilens, Jack Reise, Paul J. Geller, Stephen R. Astley, Robbins Geller Rudman & Dowd LLP, Boca Raton, FL, Harry David Rankin, Sutton, Hicks, Lucas, Grayson & Braden, PLC, Edgewood, KY, for Plaintiffs.

David Thomas Bules, James Eugene Burke, Joseph M. Callow, Jr., Anthony Michael Verticchio, Danielle Marie D'Addesa, Jennifer J. Morales, Keating Muething & Klekamp PLL, Robert Alexander Pitcairn, Jr., Katz, Teller, Brant & Hild, Glenn Virgil Whitaker, Mary C. Henkel, Dorothea K. Langsam, Vorys Sater Seymour & Pease, Cincinnati, OH, Adam Hakki, Daniel Craig Lewis, Shearman & Sterling LLP, Herbert S. Washer, Clifford Chance U.S. LLP, New York, NY, for Defendants.

### ORDER

SANDRA S. BECKWITH, Senior District Judge.

This matter comes before the Court on the following motions: Defendants' motion to dismiss (Doc. No. 78), Defendants' supplemental motion to dismiss (Doc. No. 79); Plaintiffs' motion to file an amended consolidated class action complaint (Doc. No. 83), Plaintiffs' motion to strike extraneous documents and references filed in support of Defendants' motion to dismiss (Doc. No. 90), and Plaintiffs' motion to file a surreply brief in opposition to Defendants' motion (Doc. No. 99). For the reasons that follow Defendants' motion to dismiss and supplemental motion to dismiss are **GRANTED IN PART AND DENIED IN PART;** Plaintiffs' motion to file an amended consolidated class action complaint is **MOOT;** Plaintiffs' motion to strike is **MOOT;** Plaintiffs' motion to file a surreply brief is well-taken and is **GRANTED.**

### I. *General Background*

Generally speaking, this is a securities fraud class action against Fifth Third Bancorp. and other individual and institutional defendants arising out of alleged material misrepresentations and omissions by the Defendants during the period from October 19, 2007 to June 17, 2008. The consolidated complaint is comprised of or has under its umbrella essentially four different lawsuits involving four different subclasses of owners or purchasers of securities—First Charter Bank Stock, Fifth Third common stock, Fifth Third Preferred B stock, and Fifth Third Preferred C stock. The Court will address the specifics of the alleged misrepresentations and omissions in the course of its analysis of Defendants' motion to dismiss. The basic theme of the complaint, however, is that during the class period, Fifth Third represented that it followed conservative lending policies and had adequate capital reserves. The complaint alleges that in reality, however, during the class period Fifth Third abandoned its conservative lending policies and embarked on an aggressive campaign to originate what amounted to sub-prime loans. Moreover, the complaint alleges that despite being a *de facto* sub-prime lender, Fifth Third failed to set aside adequate loan loss reserves and misleadingly blamed the deteriorating credit quality of its loan portfolio on the downturn in the macro credit market instead of its own poor lending practices. Thus, the complaint alleges, the price of Fifth Third securities was artificially inflated during the class period and abruptly collapsed on June 17, 2008 when Fifth Third announced that it would to have raise capital through new securities offerings, cutting its dividends, and selling off non-core business assets.

### II. *First Charter Subclass*

On August 15, 2007, Fifth Third's Board of Directors approved the acquisition of

First Charter Bank of Charlotte, North Carolina at a price of $31 per share. The total price of the acquisition was $1.1 billion, 70% of which was to be paid by tendering Fifth Third common stock and 30% of which was to be paid with cash. Consolidated Class Action Complaint ¶¶ 90–91 (hereinafter "Complaint" or "complaint"). On November 7, 2007, Fifth Third filed with the SEC a registration/proxy statement and prospectus for the issuance of 35,000,000 shares of common stock to be issued upon completion of the First Charter acquisition. Fifth Third's registration statement incorporated by reference its Form 10–Q for the quarter ended September 30, 2007, its Forms 8–K filed on October 29, 2007, October 31, 2007, and November 9, 2007 and "any documents filed with the SEC in the future under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended ... until we exchange all of the securities offered in this Prospectus." *Id.* ¶ 93.

The complaint alleges that the registration/proxy statement filed with the SEC contained the following material misrepresentations and omissions:

1. the consideration payable for the First Charter shares was not actually worth $31 per share;

2. Fifth Third used "a system of rigid sales quotas and lavish bonuses" to encourage its employees to originate risky and illiquid commercial and consumer loans;

3. the above risky loans included Alt–A loans that had risks comparable to subprime loans; [1]

4. Fifth Third was originating Alt–A loans with "layered risk factors"

such as high loan-to-value ratios, borrowers with credit scores below 660, unverified employment, unverified income, unverified assets, and borrowers with high debt-to-income ratios;

5. Defendants [2] aggressively marketed high loan-to-value commercial and land loans;

6. Defendants aggressively marketed Fifth Third real estate loans in Florida to European borrowers whose creditworthiness they were unable to verify;

7. as a result of its deficient underwriting and risk management practices, Fifth Third was increasingly unable to sell its loans in the secondary market and thus was forced to retain these loans in its held-for-investment portfolio;

8. the credit quality of Fifth Third's loan portfolio rapidly deteriorated from mid–2006 through 2008.

9. Fifth Third failed to timely identify and report non-performing loans;

10. Fifth Third's income was overstated throughout the class period as a result of its failure to make timely reserves for loan losses;

11. the credit quality of Fifth Third's Tier 1 capital had severely deteriorated, leaving it undercapitalized and vulnerable to future losses;

12. that as a result of the above policies or business practices, Fifth Third would be required to raise "massive amounts of capital" by cutting its annual dividend, selling billions of dollars of preferred

---

1. Alt–A loans are loans made to borrowers who are unable to provide documentation to the underwriter to verify their income and assets. *In re Impac Mortg. Holdings, Inc. Sec. Lit.,* 554 F.Supp.2d 1083, 1101 (C.D.Cal. 2008).

2. The various categories of defendants are described, *infra* at 700–01.

stock, selling assets, and seeking federal bailout money.

Complaint ¶ 106. Fifth Third failed to correct any of these alleged misstatements and omissions prior to the final closing of the First Charter acquisition on June 6, 2008. *Id.* ¶ 108–110.

On June 18, 2008, Fifth Third issued a press release stating that it needed to strengthen its capital position in light of deteriorating credit trends. Therefore, Fifth Third stated that it was going to raise $1 billion in Tier 1 capital by issuing convertible preferred shares. Fifth Third also announced that it was going to reduce its quarterly dividend from $.44 per share to $.15 per share and that it was going to raise another $1 billion in capital by selling non-core businesses. After Fifth Third made this announcement, the price of its shares dropped from $12.73 to $9.26 on heavy volume. *Id.* ¶¶ 111–12.

### III. *The Preferred B Sub-class*

The claims of the Preferred B sub-class plow much of the same ground as the First Charter sub-class. The claims of this sub-class, however, specifically relate to filings Fifth Third submitted to the SEC in October 2007 in conjunction with its public offering of 34,500,000 shares of 7.25% Fifth Third Preferred B stock. The Preferred B prospectus incorporated by reference its Form S–3 automatic shelf registration statement of March 26, 2007, which in turn was signed by the Director Defendants. The offering itself was underwritten by the Underwriter Defendants. *Id.* ¶ 158.

The Preferred B prospectus included certain financial data for the six months ended June 30, 2007 and June 30, 2006, including Fifth Third's provision for loan and lease losses of $205 million and $149 million respectively. The prospectus also reported non-performing assets of $706 million as of September 30, 2007 and a loan loss provision of $139 million for the third quarter of 2007. *Id.* ¶¶ 159–60. The complaint alleges, however, that despite reporting these numbers, the prospectus was materially misleading because it failed to disclose that Fifth Third's non-performing assets were rapidly increasing as a result of its deficient lending practices. The complaint also alleges that the prospectus was materially misleading because Fifth Third failed to increase its loan loss provision to cover the losses. Therefore, the complaint alleges, Fifth Third overstated its income. *Id.* ¶ 161. Additionally, the Preferred B sub-class alleges that the prospectus was misleading because it contained substantially the same materially misleading misrepresentations and omissions listed, *supra* at 696, for the First Charter sub-class. *Id.* ¶ 162. The Preferred B sub-class alleges that when Fifth Third made its June 18, 2008 announcement concerning the need to raise additional capital, the price of Preferred B shares dropped from $18.00 per share to $ 16.64 per share. *Id.* ¶ 163.

### IV. *The Preferred C Sub-class*

On April 28, 2008, Fifth Third filed with the SEC a prospectus for its offering of Preferred C shares, each share of which represented an undivided interest in an underlying trust consisting of $400,000,000 in junior subordinated notes. Complaint ¶¶ 188–89. The Preferred C prospectus incorporated by reference Fifth Third's Form 10–K for December 31, 2007 and Forms 8–K filed on January 14, 2008, February 25, 2008, February 28, 2008, and April 23, 2008. *Id.* ¶ 190. The Preferred C prospectus also incorporated by reference Fifth Third's shelf registration statement of March 26, 2007, which had been signed by the Director Defendants. *Id.* ¶ 191. The Underwriter Defendants were the underwriters for the Preferred C offering.

Similar to the Preferred B prospectus, the Preferred C prospectus reported pro-

visions for loan loss reserves. The prospectus reported loan loss reserves for December 31, 2007 and December 31, 2006 of $628 million and $343 million respectively. *Id.* ¶ 192. Additionally, the prospectus reported non-performing loans of $1.6 billion as of March 31, 2008 and a loan loss provision of $544 million for the first quarter of 2008. Like the Preferred B sub-class, the Preferred C sub-class alleges that the prospectus was misleading, despite reporting these figures, because it failed to disclose that Fifth Third's non-performing assets were rapidly increasing as a result of its deficient lending practices. Moreover, the complaint alleges, the prospectus was misleading because Fifth Third failed to increase its loan loss provisions. *Id.* ¶ 194. Finally, the Preferred C sub-class alleges that the prospectus contained the same series of materially misleading statements and omissions recited *supra* at 695–96 by the First Charter and Preferred B sub-classes. *Id.* ¶ 195. The Preferred C sub-class alleges that when Fifth Third made its June 18, 2008 announcement concerning the need to raise additional capital, the price of Preferred C stock dropped from $22.68 per share to $21.20 per share. *Id.* ¶ 196.

### V. *Fifth Third Common Stock Sub-class*

The Fifth Third common stock sub-class presents the most comprehensive set of allegations, taking approximately 150 pages of the complaint to set forth. The gist, however, is that Fifth Third falsely blamed its deteriorating loan portfolio on external factors, presumably beyond its control, such as declining real estate markets in Florida and Michigan and the subprime credit crisis, when in fact the problem was created when it abandoned conservative lending practices in order to generate revenue from new loan originations. Complaint ¶ 223. The specific material misstatements and omissions alleged by this sub-class can be adequately summarized as follows:

1. Defendants falsely represented that its loan loss reserves were sufficient to cover losses;

2. Defendants falsely represented that its methodology for setting aside loan loss reserves, which relied on historical loss rates, was adequate;

3. Defendants falsely represented that Fifth Third was well-capitalized and that its Tier 1 capital was not at risk;

4. Fifth Third's Third Quarter 2007 Earnings Release was false and misleading because, although it reported increased reserves for loan losses and non-performing assets, it failed to disclose that Defendants had delayed increasing reserves to an amount sufficient to cover its risky loan portfolio.

5. During an October 19, 2007 conference call with industry analysts, Defendant Marshall falsely stated that the increase in non-performing assets was due to market conditions instead of Fifth Third's deficient lending practices. Complaint ¶ 369.

6. Defendants Kabat and Marshall made the following materially false statements or omissions in Fifth Third's Form 10–Q for the third quarter of 2007:

 a. Fifth Third's earnings were overstated because Fifth Third had failed to set aside sufficient reserves to cover its risky loan portfolio; *id.* ¶ 373;

 b. the increase in non-performing loans was due to market conditions in Florida, Ohio, and Michigan and not because of Fifth Third's deficient lending practices; *id.* ¶ 374;

 c. the reports of increases in loan loss reserves were false and misleading because Fifth Third delayed increasing allowances in an amount sufficient to cover its risky loan portfolio; *id.* ¶ 377;

d. contractual provisions in certain of its mortgage products increased Fifth Third's credit exposure in the event of a decline in housing prices when at the time Fifth Third was aggressively marketing Alt–A loans comparable in quality to subprime loans; *id.* ¶ 379;

e. the report on high an-to-value residential mortgages was false because it failed to disclose that many of these loans were made to borrowers with many other risk factors, such as poor credit scores and unverifiable income and assets; *id.* ¶ 380;

f. stated that the borrower qualifications for Alt–A borrowers were comparable to conforming mortgages, and that these loans were issued for resale, when in fact the Alt–A borrower qualifications were not similar and the loans could not be resold on the secondary market, or were sold with recourse; *id.* ¶ 381.

g. stated that Fifth Third's credit risk management strategy was based on conservatism, diversification, and monitoring when in fact it had abandoned those principles; *id.* ¶ 383;

h. stated that Fifth Third was well-capitalized when it was not because of the deterioration in the quality of its loan portfolio; *id.* ¶ 385.

7. Fifth Third's Form 8–K filed on November 14, 2007, which reported a presentation to Merrill Lynch's Banking & Financial Services Conference, was materially false and misleading because its report on its borrowers' loan-to-value ratios and FICO scores gave the impression that it was using prudent lending standards when it was not. Additionally, Fifth Third failed to disclose whether it required private mortgage insurance, whether it verified key information, such as employment income and assets, whether it relied on a subjective standard of reasonableness for assessing no-documentation loans, that it had lowered its underwriting standards, that it routinely made exceptions to its underwriting standards, and that its definitions of "prime" and "subprime" were different from industry standards; *id.* ¶ 387.

8. Fifth Third's Form 8–K, filed on November 29, 2007, which reported a presentation to the Fox–Pitt, Kelton Cochran Caronia Waller Financial Services Conference, was materially false and misleading for substantially the same reasons as the November 14, 2008 Form 8–K; *id.* ¶ 389.

9. Fifth Third's Form 8–K, filed on December 18, 2007, was materially false and misleading because it continued to blame increases in loan loss reserves on general market conditions instead of its deficient underwriting standards. Additionally, Fifth Third's statements concerning its non-performing assets were materially false and misleading because they did not reflect that the number of loans delinquent for 30 to 89 days was increasing; *id.* ¶ 392;

10. Fifth Third's Earnings Release and Form 8–K of January 22, 2008 were materially false and misleading for substantially the same reasons as the December 18, 2007 Form 8–K; *id.* ¶ 395.

11. During a January 22, 2008 conference call with industry analysts, Defendants Kabat and Marshall made the following material misrepresentations and omissions:

a. stated that Fifth Third did not hold the kind of assets that would subject it to huge losses when in fact its loan quality was poor;

b. attributed the quality of its loan portfolio to the markets in the Midwest and Florida when in fact the problem was its deficient lending practices;

c. stated that Fifth Third was well-positioned for a downturn in the real estate and credit markets when it was not because of its risky lending practices;

d. stated that its Florida loan portfolio was acquired through acquisitions of other banks when instead it was created by its own origination of poor quality loans;

e. stated that Fifth Third was well-capitalized when in fact its Tier 1 capital was deteriorating; *id.* ¶¶ 396–401.

12. Fifth Third's Form 8–K, filed on January 30, 2008, which disclosed its presentation at the Citi 2008 Financial Services Conference, did not fully disclose the extent of the deterioration of its loan portfolio because it failed to recognize as impaired loans delinquent for 30 to 89 days; *id.* ¶ 404;

13. Fifth Third's Annual Form 10–K, filed on February 22, 2008, was materially false and misleading because:

a. net income was materially overstated due to Fifth Third's failure to take adequate and timely reserves for loan losses;

b. stated that Fifth Third did not originate subprime loans when it did;

c. stated that Fifth Third was well-capitalized when its Tier 1 capital was deteriorating;

d. stated that Fifth Third's methodology for setting reserves for loan losses was adequate when Generally Accepted Accounting Principles ("GAAP") required it to increase its loan loss allowance because of its deficient lending practices;

e. stated that Fifth Third's qualifications for Alt–A borrowers were comparable to the qualifications for conforming loans when they were not;

f. continued to blame market conditions for the deteriorating quality of its loan portfolio;

g. stated that a majority of its Alt–A portfolio had been sold without recourse when in fact a substantial proportion had been sold with recourse because of its poor quality; *id.* ¶¶ 405–14.

14. Fifth Third falsely stated during the April 15, 2008 annual shareholders meeting that it used conservative underwriting standards when it did not; *id.* ¶¶ 415–16;

15. Fifth Third's first quarter earnings release and Form 8–K, issued on April 22, 2008 was materially false and misleading because:

a. Fifth Third was not well-positioned relative to its competitors because of the poor quality of its loan portfolio;

b. statements concerning increases in loan loss reserves failed to account for loans 30 to 89 days delinquent and failed to reflect that Fifth Third was delaying increases in reserves;

c. statements concerning non-performing assets were materially false and misleading because they did not take into account the rapidly increasing number of loans in the 30 to 89 days delinquent category; *id.* ¶¶ 417–22.

16. During an April 22, 2008 conference call, Defendants Kabat and Marshall made the following materially false and misleading statements:

a. stated that Fifth Third had substantially increased its loan loss re-

serves when its reserves had actually decreased as a percentage of non-performing loans;

b. stated that Fifth Third was a "prime" underwriter in when it was originating de facto subprime loans;

c. failed to disclose that the credit quality of Fifth Third's loan portfolio was rapidly deteriorating; *id.* ¶¶ 423–30.

17. A May 2, 2008 press release and Form 8–K announced that Defendant Marshall "resigned" as Executive Vice President and Chief Financial Officer of Fifth Third and that Daniel Poston would serve as CFO until a permanent successor was named;[3] *id.* ¶ 432.

18. Fifth Third's First Quarter 2008 Form 10–Q was materially false and misleading for substantially the same reasons outlined *supra*—holding itself out an originator of prime mortgages, failure to take reserves for loans delinquent for 30 to 89 days, falsely stating that it employed conservative lending practices, misrepresenting the qualifications for Alt–A borrowers, and stating that the bank was well-capitalized; *id.* ¶ 433–45.

19. Fifth Third's Form 8–K, filed on May 12, 2008, which reported a presentation to the UBS Global Financial Services Conference, was materially false and misleading for substantially all of the same reasons set forth *supra*, at 695–96; *id.* ¶ 448.

On June 18, 2008, when Fifth Third announced the steps it intended to take to raise additional capital, the price of Fifth Third common stock dropped from $12.73 per share to $9.26 per share on unusually heavy volume. *Id.* ¶ 453.

## VI. *Procedural History*

As stated above, this case is the consolidation of four separate securities class actions into one lawsuit.[4] Here is the array of parties and claims before the Court.

1. First Charter sub-class, represented by lead plaintiff Edwin Shelton:

| Count | Defendants |
| --- | --- |
| I—violations of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k | Fifth Third |
| | Kevin Kabat Christopher Marshall Daniel Poston [collectively "the Individual Defendants"] Darryl F. Allen John F. Barrett James P. Hackett Gary R. Heminger Joan R. Herschede Allen M. Hill Robert L. Koch III Mitchel D. Livingston III, Ph.d Hendrik G. Meijer George A. Schaefer, Jr. John J. Schiff, Jr. Dudley S. Taft Thomas W. Traylor [collectively "the Director Defendants"] Ulysses L. Bridgeman, Jr. James E. Rogers |

| Count | Defendants |
| --- | --- |
| II. violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l | Fifth Third |
| III. violations of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o | The Individual Defendants |
| IV. violations of Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) and SEC Rule 14a–9, 17 C.F.R. § 240.14a–9 | Fifth Third The Individual Defendants |
| V. violations of Section 20(a) of the Securities | The Individual Defendants |

3. Paragraph 432 does not state why the press release and From 8–K were materially false and misleading. The quotation marks around "resigned" are from the complaint. Perhaps, therefore, the complaint is implying that Marshall was really fired.

4. The Court also consolidated with this one a fifth lawsuit, *Dudenhoefer v. Fifth Third Bancorp*, Case No. 1:08–cv–538, which is an ERISA breach of fiduciary duty action based on largely the same facts, for discovery purposes only.

Exchange Act of 1934, 15 U.S.C. § 78t(a)

2. Preferred B sub-class, represented by Plaintiffs Jacqueline Dinwoodie and Jeffery J. Wacksman:

| Count | Defendants |
|---|---|
| VI. violations of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k | Fifth Third |
| | Fifth Third Capital Trust VI |
| | The Individual Defendants |
| | The Director Defendants |
| | UBS Securities LLC |
| | Citigroup Global Markets, Inc. |
| | Merrill Lynch, Pierce, Fenner & Smith, Inc. |
| | Morgan Stanley & Co., Inc. |
| | Wachovia Capital Markets LLC |
| | Banc of America Securities LLC |
| | Credit Suisse Securities (USA) LLC |
| | [the latter seven defendants collectively "The Preferred B Underwriters |
| VII. violations of Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l | Fifth Third |
| | Fifth Third Capital Trust VI |
| | The Preferred B Underwriters |
| VIII. violations of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o | Fifth Third |
| | The Individual Defendants |

The Preferred C sub-class, represented by Plaintiff Leon C. Loewenstine:

| Count | Defendants |
|---|---|
| IX. violations of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k | Fifth Third |
| | Fifth Third Capital Trust VII Marshall |
| | The Director Defendants |
| | The Underwriter Defendants |
| | UBS Securities LLC |
| | Citigroup Global Markets, Inc. |
| | Merrill Lynch, Pierce, Fenner & Smith, Inc. |
| | Morgan Stanley & Co., Inc. |
| | Wachovia Capital Markets LLC |
| | Banc of America Securities LLC |
| | Credit Suisse Securities (USA) LLC |
| | Barclays Capital, Inc. |
| | Fifth Third Securities |
| | [the latter nine defendants collectively "the |

| | Preferred C Underwriters"] |
|---|---|
| X. violations of Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l | Fifth Third |
| | Fifth Third Capital Trust VII |
| | The Preferred C Underwriters |
| XI. violations of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o | The Individual Defendants |

The Fifth Third Common Stock sub-class, represented by co-Lead Plaintiffs Local 295/Local 851 IBT Employer Group Pension Trust and Welfare Funds and District No, 9, I.A. of M & A Pension Trust [collectively "the Pension Trust Funds"]:

| Count | Defendants |
|---|---|
| XII. violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 | Fifth Third |
| | The Individual Defendants |
| XIII. violations of Section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). | The Individual Defendants |

On July 15, 2009, Defendants filed an omnibus motion and memorandum to dismiss the consolidated class action complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. No. 78). The Underwriter Defendants filed a supplemental memorandum in support of the motion to dismiss which asserted additional grounds for dismissal of the claims peculiar to them. In response, Plaintiff's moved to file an amended consolidated complaint to clarify their Section 11 claims against the Underwriter Defendants. Doc. No. 83. Plaintiffs filed a memorandum in opposition to the motion to dismiss on September 25, 2009. Doc. No. 88. Additionally, Plaintiffs simultaneously filed a motion to strike extraneous documents and exhibits attached to Defendants' motion to dismiss. Doc. No. 90. Generally speaking, the alleged extraneous documents and exhibits are newspaper ar-

ticles reporting the recent credit crisis and additional Fifth Third SEC filings not specifically referenced in the complaint.

Principal briefing on Defendants' motion to dismiss and Plaintiffs' motion to strike was completed on November 13, 2009. On November 16, 2009, however, Plaintiffs filed a motion to file a sur-reply brief (Doc. No. 99) on the grounds that Defendants' reply brief relied heavily on a Sixth Circuit decision, *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935 (6th Cir.2009), that was issued after they filed their memorandum in opposition to the motion to dismiss. Briefing on Plaintiffs' motion to file a sur-reply brief was completed on December 23, 2009. The parties subsequently have filed several notices of supplemental authority which they contend support their respective positions. Doc. Nos. 105–07.

Each of the pending motions has been fully briefed and is ready for disposition.

### VII. *Plaintiffs' Motion to Strike*

The Court first addresses Plaintiffs' motion to strike since it potentially affects the resolution of Defendants' motion to dismiss.

Defendants' motion to dismiss relies on three categories of exhibits (47 exhibits in total) that are extraneous to the complaint: SEC filings, press releases, news reports, and stock quotations. The relevance of SEC filings and stock quotations in a securities fraud case is fairly self-evident. Defendants rely on the press releases and news reports to set forth the global credit crisis that overlapped the class period to establish fully the context in which Plaintiffs' claims arise. Defendants contend that the Court can consider all of this information in ruling on their motion to dismiss. Plaintiffs do not object to the Court's consideration of Defendants' submission of documents referenced in the complaint and historical price data. Doc.

No. 90, at 2. These unobjectionable documents are Defendants' exhibits 20, 25, and 27–47. *Id.* Plaintiffs, however, object to the Court's consideration of news articles and SEC filings and a conference call transcript which predates the class period. The objectionable documents are Defendants' exhibits 1 –24 and 26. *Id.* at 3–4.

With respect to the news articles, Plaintiffs acknowledge that the Court may properly take judicial notice that there has been an economic downturn. Doc. No. 90, at 8 n. 7. Plaintiffs, however, argue that Defendants are improperly attempting to use these articles to shift the blame for the decline of Fifth Third's stock price on the global financial climate rather than their own fraud. Plaintiffs contend that what Defendants are really asking is for the Court to resolve disputed factual questions in their favor on a motion to dismiss. Plaintiffs then argue that the SEC filings and the conference call transcript are not integral to the complaint and must be disregarded. Plaintiffs contend that if the Court does consider these exhibits, Defendants' motion to dismiss will have been converted to a motion for summary judgment. If that occurs, Plaintiffs argue that they will be entitled to conduct discovery on the matters raised by or related to the exhibits.

In deciding a Rule 12(b)(6) motion, the trial court may consider, in addition to the allegations in the complaint, "other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Wyser–Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir.2005). Plaintiffs are correct, however, that although SEC filings are public documents, the Sixth Circuit requires that they be integral to the complaint to be considered on a Rule 12(b)(6) motion. *Bovee v. Coopers & Lybrand, C.P.A.*, 272 F.3d 356, 360–61 (6th

Cir.2001) ("This Court may consider the full text of the SEC filings, prospectus, analysts' reports, and statements 'integral to the complaint,' even if not attached, without converting the motion into one for summary judgment.").

Defendants argue that the pre-class period SEC filings and the conference call transcript are integral to the complaint because the complaint faults Fifth Third for not recognizing danger signs about subprime lending before the class period. Defendants note that the complaint also cites other SEC filings and conference call transcripts that pre-date the class period. Plaintiffs reply, however, that they are entitled to rely on factual information that pre-dates the class period because the complaint has to establish each element of their claims on the first day of the class period.

As explained further below, *infra* at 716–27, the Court need not resolve this motion because the complaint fails to establish a strong inference of scienter even in the absence of Defendants' additional materials describing the extent of the global credit crisis. *See Konkol v. Diebold, Inc.*, 590 F.3d 390, 403 (6th Cir.2009) (defendant does not have burden under PSLRA to provide non-fraudulent explanation for his statements). Accordingly, Plaintiffs' motion to strike is **MOOT.**

### VIII. *Rule 12(b)(6) and the Private Securities Litigation Reform Act*

The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4, enacted by Congress to curb abuses in securities class action litigation, imposes pleading requirements more stringent than the Federal Rules of Civil Procedure. "[A] short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), is not sufficient in a private suit to recover damages for violations of the securities laws.

Where the claim is based on material misstatements and omissions, as in this case, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B). Additionally, if the claim requires proof of scienter, i.e., a showing of intent to defraud, the complaint must "with respect to each act or omission alleged ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Claims sounding in fraud must also comply with Fed.R.Civ.P. 9(b)—that is, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir.2008).

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), the Supreme Court established the procedure for resolving a Rule 12(b)(6) motion where the PSLRA applies. First, the trial court must accept all factual allegations in the complaint as being true. *Id.* at 322, 127 S.Ct. 2499. Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Id.* Where the claim requires proof of scienter, the court must consider the complaint as a whole, and not each individual allegation in isolation, to determine

whether the complaint gives rise to a strong inference of scienter. *Id.* at 323, 127 S.Ct. 2499. Third, in deciding whether the complaint does give rise to a strong inference of scienter, "the court must take into account plausible opposing inferences." *Id.* This means that the court "must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324, 127 S.Ct. 2499. Under this standard, "[a] complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## IX. *Analysis*

### A. *Alleged violations of the Securities Act of 1933*

Counts I, VI, and IX of the complaint assert claims for violations of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k. Counts II, VII, and X of the complaint assert claims for violations of Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*. Counts III, VIII, and XI of the complaint assert claims for violations of Section 15 of the Securities Act of 1933, 15 U.S.C. § 77*o*. These claims only concern the First Charter, Preferred B and Preferred C subclasses.

■■■ Section 11 of the Securities Act imposes liability on persons who sign securities registration statements containing untrue statements of material fact or omissions of material fact. *J & R Marketing, SEP v. General Motors Corp.*, 549 F.3d 384, 390 (6th Cir.2008). "Section[ ] 11 ... impose[s] a duty to disclose additional facts when a statement of material fact made by the issuer is misleading, and ... impose[s] liability for failing to fulfill that duty of disclosure as well as for misstating a material fact." *Id.* In order to state a claim for relief under Section 11,

the plaintiff must allege facts showing that: (1) he purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under Section 11; and (3) the registration statement contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading. *In re Morgan Stanley Information Fund Sec. Lit.*, 592 F.3d 347, 358–59 (2nd Cir.2010).

■■■ In *Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983), the Supreme Court explained that:

> Th[is] section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering. If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case. Liability against the issuer of a security is virtually absolute, even for innocent misstatements.
>
> . . .
>
> Although limited in scope, Section 11 places a relatively minimal burden on a plaintiff.

*Id.* at 382–83, 103 S.Ct. 683. A Section 11 plaintiff is not required to plead or prove that the defendant acted with scienter. *Id.* at 383, 103 S.Ct. 683.

■■■ Section 12(a)(2) of the Securities Act of 1933 is similar to Section 11 in that it imposes liability against a seller of securities by means of a prospectus or oral communications containing materially misleading statements or omissions. *Morgan Stanley*, 592 F.3d at 360. Section 12(a)(2)

only imposes liability on "statutory sellers" of securities, i.e., those who have (1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner. *Id.* Thus, in order to state a claim for relief under § 12(a)(2), the plaintiff must allege that: (1) the defendant is a "statutory seller"; (2) the sale was effectuated by means of a prospectus or oral communication; and (3) the prospectus or oral communication included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. *Id.* Like Section 11, Section 12(a)(2) does not have a scienter requirement. *Id.* at 359.

Defendants proffer four reasons why the complaint fails to state claims for violations of the Securities Act. First, Defendants argue that the complaint fails to set forth any materially misleading statements or omissions. Second, Defendants contend that to the extent that these claims sound in fraud, they fail to meet Rule 9(b)'s requirement to plead fraud with particularity. Third, Defendants claim that the complaint fails to adequately plead loss causation. Fourth, Defendants argue that Plaintiffs in the Preferred B and Preferred C subclasses lack standing to assert Section 12 claims.

### 1. *Materiality*

Section 11 and Section 12 both require that the misstatement or omission at issue be material. An omission or misrepresentation is material if there is a substantial likelihood that a reasonable investor would have viewed the omitted or misrepresented fact as having significantly altered the total mix of information available. *Basic, Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The

Supreme Court has cautioned, however, that "[s]ome information is of such dubious significance that insistence on its disclosure may accomplish more harm than good." *TSC Ind., Inc. v. Northway, Inc.,* 426 U.S. 438, 448, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Imposing liability for some omissions or misstatements would cause management "simply to bury the shareholders in an avalanche of trivial information that is hardly conducive to informed decisionmaking." *Id.* at 448–49, 96 S.Ct. 2126. Materiality presents a mixed question of law and fact requiring "delicate assessments" of the inferences a reasonable shareholder would draw from a given set of facts. *Id.* at 450, 96 S.Ct. 2126. It is only if the omissions or misstatements are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue appropriately resolved as a matter of law [by the court]." *Id.* (internal quotation marks omitted). In *Thiemann v. OHSL Fin. Corp.,* No. C–1–00–CV–793, 2001 WL 34128240 (S.D.Ohio July 25, 2001) (Beckwith, J.), this Court stated that "[t]he inverse proposition of this holding is that only when a misstatement or omission is so obviously unimportant that reasonable minds cannot differ on the question of materiality that the ultimate issue is appropriately resolved as a matter of law by the court."). *Id.* at *6; *see also In re Westinghouse Sec. Lit.,* 90 F.3d 696, 707 n. 8 (3rd Cir.1996) (same).

■ The parties agree that the alleged misstatements and omissions at issue for these subclasses concern Fifth Third's loan loss provisions, charge-offs, non-performing assets, capital ratios, and underwriting standards. And, for the First Charter sub-class, the misstatements and/or omissions also concern the consideration paid for First Charter shares in the acquisition.

### a. Loan Loss Provisions, Charge-offs and Non–Performing Assets

Loan loss provisions, charge-offs and non-performing assets are related concepts in this case in that the complaint alleges that throughout the class period Fifth Third either purposefully delayed recognizing delinquent loans as non-performing assets or that Fifth Third should have recognized delinquent loans as non-performing assets sooner than it actually did, as in the case of loans delinquent for 30 to 89 days. As a result of allegedly not recognizing loans as non-performing assets properly, Fifth Third's reserves for losses were inadequate with the consequent effect that net income was overstated on its financial statements.

In *Mayer v. Mylod*, 988 F.2d 635 (6th Cir.1993), the Court held that the following allegations were sufficient to state claims for material misrepresentations and omissions:

> Defendants misrepresented and concealed the deteriorated quality of Michigan National's loan portfolio, intentionally concealed and misrepresented the likelihood of huge increases in non-performing assets, charge-offs and loss reserves, and failed to set appropriate loan loss reserve levels on commercial real estate loans. Michigan National's net income, assets and net worth were materially overstated as a result, and the market prices of Michigan National's publicly-traded securities were artificially inflated.

*Id.* at 637, 639. These allegations are substantially similar to the allegations that the First Charter, Preferred B, and Preferred C sub-classes assert against Fifth Third with respect to its loan portfolio and loan loss reserves. Since these kinds of statements were material in Mayer, the Court must conclude that the similar allegations in this case are material as well.

### b. Underwriting Standards

Several courts have held that where a bank touts but then abandons its conservative loan underwriting standards without disclosing the change, statements concerning its lending policies are materially misleading. *See, e.g., In re Countrywide Fin. Corp. Deriv. Lit.*, 554 F.Supp.2d 1044, 1072, 1076–77 (C.D.Cal.2008) (finding that the underwriting practices of a mortgage originator would be among the most important information on which investors rely); *In re Washington Mut., Inc. Sec., Deriv. & ERISA Lit.*, 259 F.R.D. 490, 505–06 (W.D.Wash.2009); *but see In re Security Capital Assur., Ltd. Sec. Lit.*, No. 7 Civ. 11086(DAB), 729 F.Supp.2d 569, 597–98, 2010 WL 1372688, at *28 (S.D.N.Y. Mar. 31, 2010) (statement that a corporation employs conservative underwriting policies amounts to puffery that is not actionable). *Countrywide* and *Washington Mutual* are identical to this case in that not only did plaintiffs allege that those financial institutions failed to disclose a change to more risky lending practices, the banks in those cases also provided financial incentives to its employees which emphasized loan quantity over loan quality, thereby increasing the banks' exposure to defaults. *Countrywide*, 554 F.Supp.2d at 1058–59. Similarly, in *Mayer*, the Court held that the defendant made a material misstatement when, *inter alia*, in light of the bank's deteriorating loan portfolio and the likelihood of increases in non-performing assets and charge-offs, he commented that its loan portfolio was "soundly underwritten." 988 F.2d at 636–37, 639. Accordingly, the Court concludes that statements concerning the soundness or reliability of Fifth Third's underwriting standards or practices are material. Additionally, the Court holds that it would be a material omission, if, as the complaint alleges, Fifth Third concealed that it was relaxing its underwriting standards.

On the other hand, the Court finds that Defendants' alleged omissions concerning sales quotas, incentives, and bonuses to increase new loan originations are not material because this is the type of minutia that would inundate the investor with "an avalanche of trivial information." *TSC Indus.*, 426 U.S. at 448, 96 S.Ct. 2126. Plaintiffs essentially allege that Fifth Third should have disclosed that it implemented sales policies and a compensation structure which incentivized its employees to approve loans to substandard borrowers. To a large degree, however, these types of omissions are subsumed within Plaintiffs' claims concerning Fifth Third's alleged relaxation of lending standards because the quotas and incentives allegedly led Fifth Third to relax its lending standards. More importantly, however, the sales policies and incentives are essentially the day-to-day operational details of implementing the strategy of increasing new loan originations. Most investors would fail to connect the existence of sales quotas and incentives with an increased risk that the credit quality of Fifth Third's loan portfolio would decrease. The Court's own research has not discovered any case in which the compensation structure of non-executive employees was held to be a material fact requiring disclosure to investors. Accordingly, these alleged omissions are not material as a matter of law.

### c. Consideration for First Charter Shares

The final category of misstatement at issue here is the consideration Fifth Third was to pay for First Charter shares. As stated, the registration statement indicated that Fifth Third would pay $31 for each First Charter share, to be paid by a combination of cash and Fifth Third shares. The First Charter subclass claims that the consideration paid for their shares was not $31 because the price of Fifth Third stock was inflated due to the alleged misstatements and omissions. It would seem to go

without saying that any misrepresentation concerning the consideration a shareholder would receive for his shares in a merger or acquisition would be material information which would affect his voting decision. Defendants argue that the registration statement was not misleading as to consideration because it never guaranteed a value of $31 per share. Moreover, Defendants argue, the registration statement explained the conversion ratio to First Charter shareholders and warned them that the price of Fifth Third stock could increase or decrease before the closing date because of a number of factors. In response, Plaintiffs point out that the First Charter board approved the merger specifically on the basis that the consideration paid by Fifth Third would equal $31 per First Charter share. Additionally, to the extent the complaint was unclear or ambiguous, Plaintiffs' brief clarifies that they are not claiming that the registration statement was misleading as to the conversion ratio or whether there would be a fluctuation in Fifth Third stock prior to the merger. Rather, Plaintiffs claim that because Fifth Third shares allegedly were artificially inflated during the class period, due to the alleged misstatements and omissions, their consideration did not actually equal $31 per share. Another way of stating it would be that Plaintiffs are claiming that had the price of Fifth Third stock not been artificially inflated during the class period, they would have received more Fifth Third shares in exchange for their First Charter shares.

With that understanding of the complaint, the Court concludes that Plaintiffs state a claim that the First Charter registration statement was materially misleading as to consideration. As just stated, it is self-evident that a shareholder would find statements concerning the consideration to be paid for his shares in a merger

708

to be material to his decision-making process.

### 2. *Forward-looking Statements*

Defendants argue that even if the alleged misstatements and omissions set forth in the complaint are material, many of them are protected by the PSLRA safe harbor, which excepts forward-looking statements from liability. In particular, Defendants argue that statements concerning Fifth Third's loss reserves are necessarily forward-looking since the adequacy of reserves is contingent upon future events.

 The PSLRA safe harbor: excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance. A plaintiff may overcome this protection only if the statement was material; if defendants had actual knowledge that it was false or misleading; and if the statement was not identified as "forward-looking" or lacked meaningful cautionary statements.

*Zaluski v. United American Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir.2008) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547–48 (6th Cir.2001)). In order to be meaningful, the cautionary statements cannot be boilerplate. *Helwig*, 251 F.3d at 558. Rather, "the cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business." *Id.* at 558–59 (quoting H.R. Conf. Rep. No. 04–369, at 43 (1995), U.S.Code Cong. & Admin.News 1995, pp. 730, 742).

 With that standard in mind, several of the alleged misstatements and omissions set forth in the complaint concerning Fifth Third's reserves and capitalization are forward-looking and, although not accompanied by meaningful cautionary language, there are no facts pled which demonstrate that the statements were made with actual knowledge of their falsity. *In re Compuware Securities Lit.*, 301 F.Supp.2d 672, 683 (E.D.Mich.2004). Specifically, the following statements fall within the safe harbor:

1. Defendant Marshall's statement during the April 22, 2008 conference call that "I wouldn't expect us to do anything out of the ordinary and certainly nothing resembling the extreme capital raises you've seen from some of our more stressed peers ... We don't think that's—we think of ourselves as being in an entirely different category and don't need to do any of those things," Complaint ¶ 284, is by definition a forward-looking statement because it is a projection concerning Fifth Third's capital structure. *See* 15 U.S.C. § 78u–5(i)(1)(A); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 803 (11th Cir.1999) (statement that company is "well-positioned" was forward-looking).

2. Defendant Marshall's statements during an October 19, 2007 conference call concerning whether Fifth Third would have a sale of non-performing assets in the fourth quarter and whether restructuring troubled debt would reduce the growth in nonperforming assets are projections or predictions and thus are forward-looking statements. Complaint ¶ 368.

3. Defendant Marshall's statements in the January 22, 2008 conference call concerning Fifth Third's targeted and expected level of Tier 1 capital is a projection and is thus forward-looking. Complaint ¶ 400.

4. Defendant Marshall's statement in the April 22, 2008 conference call that "we expect our capital to be comfortably within our targets" is a projection and is thus forward-looking. Complaint ¶ 427.

These statements are all forward-looking, and, though lacking meaningful cau-

tionary language,[5] there are no facts pled indicating that they were made with actual knowledge of their falsity.[6] Therefore, they fall within the PSLRA safe harbor and are not actionable. Accordingly, Defendants' motion to dismiss is well-taken and is **GRANTED** as to these alleged misstatements.

### 3. *Applicability of Rule 9(b)*

██ Defendants next argue that Plaintiffs' Section 11 Securities Act claims sound in fraud and that, therefore, they must comply with Rule 9(b) of the Federal Rules of Civil Procedure and plead these claims with particularity. Fraud is not an element of Securities Act claims. *In re Charles Schwab Corp. Sec. Lit.*, 257 F.R.D. 534, 548 (N.D.Cal.2009). Defendants are correct, however, that Securities Act claims sounding in fraud must comply with Rule 9(b). *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 948 (6th Cir.2009). The complaint denies that the Securities Act claims allege fraud, Complaint ¶ 89, and Plaintiffs rely on that disclaimer in arguing that they do not have to comply with Rule 9(b). A blanket disavowal in the complaint that the claims do not allege fraud, however, is insufficient to rescue them from the requirements of Rule 9(b). *California Pub. Emp. Ret. Sys.*

*v. Chubb Corp.*, 394 F.3d 126, 160 (3rd Cir.2004) ("The one-sentence disavowment of fraud contained within Plaintiffs' section 11 Count—Count II of the Second Amended Complaint—does not require us to infer that the claims are strict liability or negligence claims, and in this case is insufficient to divorce the claims from their fraudulent underpinnings."); *In re Alstom S.A. Secs. Lit.*, 406 F.Supp.2d 402, 410 (S.D.N.Y.2005) ("Plaintiffs cannot so facilely put the fraud genie back in the bottle."). Moreover, Plaintiffs' allegation that their Securities Act claims do not sound in fraud is a legal conclusion that the Court does not have to accept as being true. *Lewis v. ACB Business Services, Inc.*, 135 F.3d 389, 405 (6th Cir.1998).

Nevertheless, upon review of the motion to dismiss, it appears to the Court that in arguing that the complaint fails to comply with Rule 9(b), Defendants rely on their contention that the allegations concerning the Section 11 claims fail to establish scienter. *See* Doc. No. 89, at 100 (stating that "for all of the reasons explained ... *supra*, Plaintiffs failed to plead scienter against any defendant."). As just stated, however, the requirement to plead fraud with particularity does not require the complaint to plead intent to defraud with particularity. Accordingly, to the extent

---

5. Each of the conference calls was prefaced by essentially the same cautionary statement:
 This call contain[s] certain forward looking statements about Fifth Third Bancorp. pertaining to our financial conditions, results of operations, plans, and objectives.
 These statements involve certain risks and uncertainties. There are a number of factors that could cause results to differ materially from historical performance in these statements. Fifth Third undertakes no obligation to update these statements after the date of the call.
 *E.g.* Doc. No. 82–37, at 3–4 (Transcript of January 22, 2008 analysts' conference call). These cautionary statements are not meaningful because they fail to impart any substantive

information about factors that could cause results to differ from the forward looking statements. Consequently, the cautionary statements are merely boilerplate.

6. In arguing that the complaint pleads facts demonstrating that Defendants had actual knowledge of the falsity of the forward-looking statements, Plaintiffs essentially rely on the same facts and arguments they contend establish scienter. As explained further below, *supra* at 716–27, the complaint fails to establish scienter. Therefore, for the same reasons, the Court concludes that the complaint fails to allege facts demonstrating that Defendants had actual knowledge of the falsity of these statements.

that the motion to dismiss the Section 11 claims is based on the failure to plead scienter with particularity, it is not well-taken and is **DENIED.**

Defendants' Rule 9(b) argument also adverts to the section of its brief which contends that the complaint fails to plead any actionable misstatements or omissions. *See id.* That section of the brief, however, is not framed in the context of Rule 9(b) and, other than Defendants' general assertion that the Section 11 claims do not comply with Rule 9(b), they fail to specify how and why the complaint lacks the requisite specificity. Accordingly, the Court concludes that Defendants are not entitled to dismissal of these claims for failure to comply with Rule 9(b).

### 4. *Loss Causation*

Defendants also argue that Plaintiffs' Securities Act claims are subject to dismissal on the grounds that the complaint shows on its face that their losses were not caused by the Defendants' alleged misstatements and omissions. Defendants contend that the complaint fails to allege facts connecting the revelation of a secret fraud to the decline in the price of Fifth Third stock. Thus, Defendants argue that the complaint only shows that the price of Fifth Third stock declined after the revelation of bad news, which is insufficient to show loss causation.

 "Loss causation" refers to the plaintiff's burden to "show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market." *Omnicare,* 583 F.3d at 944. Defendants, however, correctly recognize that loss causation is not an element of a Securities Act claim but rather an affirmative defense to it. *Id.* at 947. Where a Rule 12(b)(6) motion is based on an affirmative defense, the complaint must show on its face that the claim is barred by the defense. *Riverview Health Inst. LLC v. Medical Mut. of Ohio,*

601 F.3d 505, 513 (6th Cir.2010). "In a situation involving an affirmative defense, the claim is stated adequately, but in addition to the claim the contents of the complaint includes matters of avoidance that effectively vitiate the pleader's ability to recover on the claim. In such a situation the complaint is said to have a built-in defense and is essentially self-defeating." *Id.* (quoting 5B Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed.2004))(internal quotation marks, ellipses and brackets omitted).

 The complaint attributes the decline in Fifth Third stock solely to the June 18, 2008 press release in which Fifth Third announced that in order to strengthen its capital position in light of deteriorating credit trends, it was going to issue $1 billion in new convertible preferred shares, cut its dividend, and sell certain non-core businesses. Complaint ¶ 111. The Court agrees with Defendants that on its face the complaint fails to establish loss causation with respect to many of the misrepresentations and omissions alleged because the press release did not contain any disclosures or corrections addressed to them. *See, e.g., Omnicare,* 583 F.3d at 944 ("[A] plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market."); *D.E. & J.L.P. v. Conaway,* 133 Fed.Appx. 994, 1000–01 (6th Cir. 2005) (loss causation not established when company announced filing of bankruptcy petition because bankruptcy announcement did not disclose any prior misrepresentations to the market); *In re Britannia Bulk Holdings Inc. Sec. Lit.,* 665 F.Supp.2d 404, 419–20 (S.D.N.Y.2009) (granting defendants' Rule 12(b)(6) motion on affirmative defense of loss causation because sole disclosure upon which plaintiffs relied did not "reveal to the market the falsity" of its offering documents); *In*

*re Initial Pub. Of. Sec. Lit.,* 399 F.Supp.2d 261, 265, 266–67 (S.D.N.Y.2005) (in order to establish loss causation, there needs to be a disclosure or event that corrects the alleged misrepresentations and omissions). Specifically, the Court finds as follows with respect to these alleged misrepresentations and omissions:

1. *Failure to disclose sales quotas and bonuses to encourage origination of risky loans.* There is no loss causation because the press release did not disclose that such programs were in place or that Fifth Third was revising or eliminating such programs in order to strengthen the quality of its loan portfolio.

2. *Failure to disclose that Alt–A loan portfolio was the same or similar to subprime loans.* There is no loss causation because Fifth Third did not announce that it had misstated or mis-evaluated the characteristics of its Alt–A loan portfolio.

3. *Failure to disclose that Alt–A loan portfolio had "layered risk factors."* Again, there is no loss causation because there was no disclosure amending or modifying Fifth Third's description of its Alt–A portfolio.

4. *Failure to disclose aggressive marketing of high loan-to-value loans.* There is no loss causation because there was no disclosure that Fifth Third was discontinuing marketing high loan-to-value loans or that it was modifying its marketing strategy with respect to such loans.

5. *Aggressively marketing real estate loans to European borrowers with unverifiable credit histories.* There is no loss causation because Fifth Third did not announce that it was discontinuing marketing such loans or that it was modifying its marketing strategy with respect to such loans.

6. *Failure to disclose inability to sell loans on secondary market.* There is no loss causation because Fifth Third did not announce that it was unable to sell its loans on the secondary market in the press release.

7. *Failure to disclose deteriorating credit quality of loan portfolio.* There is loss causation with respect to this alleged misrepresentation or omission because Fifth Third's need to restructure its capital position was, according to the press release, due to "continued deterioration in credit trends."

8. *Failure to identify non-performing loans.* There is no loss causation because Fifth Third did not disclose any accounting changes with respect to non-performing loans.

9. *Overstatement of income.* There is no loss causation because Fifth Third did not announce that it was restating its earnings.

10. *Deterioration in Tier 1 capital/need to raise capital.* There is loss causation with respect to these misrepresentations or omissions because the press release specifically states that Fifth Third was issuing preferred securities to bolster its Tier 1 capital.

11. *Failure to disclose the need to raise additional capital.* There clearly is loss causation for this alleged omission because the topic of the press release was Fifth Third's need to bolster its capital position.

Accordingly, Defendants' motion to dismiss Plaintiffs' Securities Act claims is well-taken and is **GRANTED** with respect to alleged misstatements or omissions 1–6, and 8–9, as identified above.

### 5. *Interim Summary*

In summary, the Section 11 and Section 12(a) claims of the First Charter subclass are dismissed, except for claims relating to omissions and misstatements concerning the consideration to be paid for First Charter shares in the acquisition, failure to disclose deteriorating quality of Fifth Third's loan portfolio, failure to disclose

the deterioration of Tier 1 capital, and failure to disclose the need to raise additional Tier 1 capital. Similarly, the Section 11 and Section 12(a) claims of the Preferred B sub-class and Preferred C subclass are dismissed except for claims relating to omissions and misstatements concerning the failure to disclose the deteriorating quality of Fifth Third's loan portfolio, failure to disclose the deterioration of Tier 1 capital, and failure to disclose the need to raise additional Tier 1 capital.

### 6. *Section 12(a)(2) claims of the Preferred B and Preferred C Sub-classes*

■■■ Defendants also proffer additional grounds for dismissal of Plaintiffs' Section 12(a)(2) claims of the Preferred B and Preferred C sub-classes. Defendants first argue that the claims of the Preferred B Plaintiffs, Dinwoodie and Wacksman, should be dismissed for lack of standing because they purchased their shares on the open market, below the offering price, and not pursuant to the prospectus. Defendants also argue that the claims against the Underwriter Defendants should be dismissed as to both subclasses because the complaint fails to identify from which underwriter Plaintiffs purchased their shares. In response, Plaintiffs argue that the Preferred B Plaintiffs have standing, even though they concede that they purchased their shares on the open market, because the prospectus for that offering was in effect at the time of their purchases. In response to Defendants' arguments concerning Plaintiffs' failure to identify a specific underwriter from whom they purchased their shares, the class representatives for these sub-classes have tendered affidavits clarifying that point. In reply, however, Defendants argue that Plaintiffs cannot correct by affidavit deficient factual allegations in the complaint. Moreover, Defendants point out that, according to their affidavits, both Dinwoodie and Wacksman purchased their Preferred B

shares from Raymond James & Associates, who is not a defendant in this case. Therefore, Defendants argue that the 12(b)(2) claims of the Preferred B sub-class against all of the Underwriter Defendants should be dismissed. Defendants also point out that according to his affidavit, the Preferred C class representative, Loewenstine, purchased his shares only from UBS Securities, Inc. Therefore, Defendants argue, while UBS is a defendant in this case, the 12(a)(2) claims of the Preferred C sub-class should be dismissed as to the remaining Underwriter Defendants.

Initially, the Court agrees with Defendants that since the Preferred B class representatives did not purchase their shares from an underwriter who is a defendant in this case, their Section 12(a)(2) claims against all of the Underwriter Defendants must be dismissed for failure to state a claim. *See In re WorldCom, Inc. Sec. Lit.,* 346 F.Supp.2d 628, 659 (S.D.N.Y. 2004) ("To be liable as a seller, the defendant must be the "buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers."); *In re Royal Ahold N.V. Sec. & ERISA Lit.,* 351 F.Supp.2d 334, 406 (D.Md.2004) ("In order to state a claim under § 12(a)(2), the complaint must allege by whom the plaintiffs were solicited and from whom they purchased shares; these assertions must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser."); *see also Akerman v. Oryx Comm., Inc.,* 810 F.2d 336, 344 (2nd Cir.1987) (holding that, absent scienter, Section 12(a)(2) requires privity between the buyer and seller).

Similarly, according to his affidavit, the Preferred C class representative, Loewenstine, purchased his shares from UBS only. Accordingly, the claims of the Pre-

ferred C sub-class against all of the Underwriter Defendants except UBS must be dismissed. Defendants argue that Plaintiffs cannot amend their complaint through their brief and thus, implicitly if not explicitly ask the Court to ignore Loewenstine's affidavit. Loewenstine's affidavit arguably converts Defendants' Rule 12(b)(6) motion into a Rule 56 motion for summary judgment, at least on this one issue. If it does, then there are no issues of material fact concerning the underwriter from whom Loewenstine bought his shares and his claims against all of the Underwriter Defendants but UBS should be dismissed on the grounds raised by Defendants. To the extent that there are no specific allegations in the complaint concerning Loewenstine purchasing shares from UBS, this case is similar to *E.E.O.C. v. Ohio Edison Co.*, 7 F.3d 541 (6th Cir.1993). In that case, a Title VII retaliation action, the employer moved to dismiss the complaint pursuant to Rule 12(b)(6), or for a more definite statement, on the grounds that the complaint failed to indicate a causal link between plaintiff's protected activity and the adverse employment action. In opposing the motion, plaintiff stated in his brief that the causal link was established through his representative's complaints about more favorable treatment of Caucasian employees and a threat to pursue legal action. The trial court granted the employer's Rule 12(b)(6) motion but the Court of Appeals held that the trial court erred because *"plaintiff's brief in opposition to the Rule 12(b)(6) motion* indicated that Ohio Edison had been notified through the EEOC charge that a co-employee had acted as a representative on Whitfield's behalf, protesting that his discharge was motivated by race and that he was going to file a claim." *Id.* at 546 (emphasis added). The Court stated that "the district court erred in dismissing the complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim because the allega-

tion of a causal link was apparent." *Id.* Alternatively, the Court held that the trial court should have granted the employer's motion for a more definite statement. *Id.* In light of *Ohio Edison*, it seems apparent that Loewenstine's affidavit is sufficient to withstand the motion to dismiss as to UBS. Alternatively, construing Plaintiffs' pleadings liberally so as to due substantial justice, Fed.R.Civ.P. 8(e), Loewenstine's affidavit can be considered a more definite statement concerning the underwriter from whom he purchased his Preferred C shares. Under either circumstance, the pleadings sufficiently establish UBS as the seller of the Preferred C shares to Loewenstine.

▪▪▪ With regard to the overall standing of the Preferred B sub-class, Section 12(a)(2) applies only to purchases made through initial offerings and not to aftermarket trading. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). The majority of courts who have considered this issue has concluded that purchasers who buy their shares on the secondary market lack standing to assert Section 12(a)(2) claims. E.g., *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870–71 (5th Cir.2003); *Joseph v. Wiles*, 223 F.3d 1155, 1161 (10th Cir.2000) (stating that Section 12(a)(2) gives "a cause of action only to individuals who purchase securities directly from a person who sells the securities by means of a prospectus."); *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 689 (3rd Cir.1991); *Caiafa v. Sea Containers Ltd.*, 331 Fed.Appx. 14, 16–17 (2nd Cir.2009); *In re Enron Corp. Sec.*, 529 F.Supp.2d 644, 659 n. 1 (S.D.Tex. 2006); *In re Cosi, Inc. Sec. Lit.*, 379 F.Supp.2d 580, 588–89 (S.D.N.Y.2005); *In re Hayes Lemmerz Int'l, Inc.*, 271 F.Supp.2d 1007, 1029 (E.D.Mich.2003). *In re Sterling Foster & Co., Inc. Sec. Lit.*, 222 F.Supp.2d 216, 244 (E.D.N.Y.2002) (noting

that it is the "predominate position" in the Second Circuit "that purchasers in private or secondary market offerings are precluded from bringing actions under Section 12(a)(2)."); *In re FirstEnergy Corp. Sec. Lit.*, 316 F.Supp.2d 581, 602 (N.D.Ohio 2004); *In re Adams Golf, Inc. Sec. Lit.*, 176 F.Supp.2d 216, 224–25 (D.Del.2001), *rev'd in part on other grounds*, 381 F.3d 267 (3rd Cir.2004). Plaintiffs' principal case in opposition to this weight of authority is *Feiner v. SS & C Tech., Inc.*, 47 F.Supp.2d 250 (D.Conn.1999). In *Feiner*, the district court concluded that § 12(a)(2) applies to aftermarket trading so long as it occurs by means of a prospectus or oral communication. According to that court's analysis, § 12(a)(2) applies to aftermarket trading during the period in which the statutes or regulations require delivery of a prospectus with the sale of securities. *See id.* at 253. This Court, however, does not find *Feiner* persuasive. *Feiner* is contrary to the great weight of authority and, indeed, represents the minority opinion even within the Second Circuit. *See, supra*, at 710; *see also In re Levi Strauss & Co. Sec. Lit.*, 527 F.Supp.2d 965, 983 (N.D.Cal.2007) ("[T]he majority of the cases appear to hold that, based on *Gustafson*, § 12 is limited to transactions purchased pursuant to a public offering and, therefore, does not extend to *any* after market transactions.") (emphasis in original). Moreover, as the district court stated in *Levi Strauss*, *Feiner* is contrary to the dicta in *Gustafson*, which noted that the term "prospectus" was well understood to relate to a document soliciting the public to acquire securities from the issuer. 527 F.Supp.2d at 983. Additionally, the *Levi Strauss* court also noted that the Supreme Court has indicated in dicta that the Securities Act regulates the initial distribution of securities and the Securities Exchange Act generally regulates post-distribution trading. *Id.* (quoting in part *Central Bank of Denver, N.A. v. First*

*Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994)). The Supreme Court's dicta is nearly as binding as its holdings and should be followed unless there is a substantial reason for disregarding it, such as age or subsequent statements undermining its rationale. *United States v. Marlow*, 278 F.3d 581, 588 n. 7 (6th Cir.2002). Thus, *Feiner* stands alone against almost all of the other authority on this subject, including Supreme Court dicta which is entitled to substantial if not complete deference. The Court, therefore, concludes that the Preferred B Plaintiffs lack standing under § 12(a)(2) because they did not purchase their shares pursuant to the initial public offering of those securities.

Accordingly, Defendants' motion to dismiss the Section 12(a)(2) claims of the Preferred B sub-class is well-taken and is **GRANTED.** Defendants' motion to dismiss the Section 12(a)(2) claims of the Preferred C sub-class is well-taken and is **GRANTED,** except as to Underwriter Defendant UBS Securities.

### 7. *Controlling Person Liability*

 The First Charter subclass, Preferred B sub-class, and the Preferred C subclass asserts claims against Fifth Third and the Individual Defendants (Defendants Kabat, Marshall, and Poston) for controlling person liability for the alleged misstatements and omissions identified in the complaint pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o. (Counts III, VIII, and XI). Section 15 imposes joint and several liability on "controlling persons" for violations of Section 11 or Section 12 of the Act committed by persons they control. *Sanders Confectionery Prod., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 485 (6th Cir.1992); *Herm v. Stafford*, 663 F.2d 669, 679 (6th Cir.1981). In order to state a claim for control person liability, the plaintiff must plead sufficient facts to

establish: (1) a primary securities law violation; (2) power to control the specific transaction or activity upon which the primary violation is predicated; and (3) actual participation (i.e., exercise of control) in the operations of the primary violator in general. *In re Prison Realty Sec. Lit.*, 117 F.Supp.2d 681, 692 (M.D.Tenn.2000). Since liability as a controlling person is derivative, dismissal of a Section 15 claim is appropriate where there is no primary liability under Section 11 or Section 12. *J & R Marketing, SEP v. General Motors Corp.*, 549 F.3d 384, 398 (6th Cir.2008).

Accordingly, to the extent the Court has already dismissed Plaintiffs' Section 11 and Section 12 claims, the corresponding Section 15 claims are dismissed as well.

Defendants also argue that the Plaintiffs' Section 15 claims should be dismissed because the complaint fails to specify how each of the Individual Defendants participated in the challenged disclosures. Defendants argue that the complaint's allegations that they exercised control "by virtue of their executive and/or directorial positions of the Company" and "by virtue of their sponsorship and/or positions as trustees of Fifth Third Capital Trust" are insufficient to establish control person liability.

■ Defendants are correct that an executive or director is not liable under Section 15 as a controlling person simply because of his position with the company. *Frank v. Dana Corp.*, 649 F.Supp.2d 729, 746 (N.D.Ohio 2009); *Lansing Automakers' Federal Credit Union v. MCG Portfolio Mgmt. Corp.*, No. 5:89–CV–52, 1991 WL 238974, at *3 (W.D.Mich. Sept. 12, 1991). Rather, to be liable as a control person, the defendant must have exercised some degree of control or influence over the operations of the company to be liable as a controlling person. *Picard Chem., Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1134 (W.D.Mich.1996).

■ In their motion, the Individual Defendants essentially highlight allegations which tend to show that Plaintiffs claim controlling person liability simply because they are executives of Fifth Third. The Court notes, however, that the complaint alleges that each of the Individual Defendants reviewed, approved, and signed allegedly false and misleading filings with the SEC, including registration/proxy statements, shelf registration statements, Forms 10–K, 10–Q, and 8–K. Complaint ¶¶ 43–45. These allegations are sufficient to establish that the Individual Defendants are liable as controlling persons. *Knollenberg v. Harmonic, Inc.*, 152 Fed.Appx. 674, 685 (9th Cir.2005); *see also In re Lehman Bros. Sec. & Erisa Lit.*, 684 F.Supp.2d 485, 495 (S.D.N.Y.2010) (individual defendants who were officers and directors of company who signed registrations statements were controlling persons under Section 15); *In re Calpine Corp. Sec. Lit.*, 288 F.Supp.2d 1054, 1081 (N.D.Cal.2003) (complaint failed to state a claim for controlling person liability where there are no allegations that individual defendants signed or helped prepare allegedly false and misleading shelf registration statement and prospectus); *In re Enron Corp. Sec., Deriv. & ERISA Lit.*, 258 F.Supp.2d 576, 598 (S.D.Tex.2003) (persons who sign financial documents and registration statements are controlling persons).

Accordingly, Defendants' motion to dismiss the surviving Section 15 claims on the grounds that the complaint alleges liability based solely on Defendants' positions as executives of Fifth Third is not well-taken and is **DENIED.**

### 8. *Section 14(a) of the Securities Exchange Act*

The First Charter sub-class alleges that Fifth Third and the Individual Defendants violated Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a),

and SEC Rule 14a–9, 17 C.F.R. § 240.14a–9, by making false and misleading statements and omissions in a registration/proxy statement. The same set of alleged misstatements and omissions form the basis of the First Charter sub-class's Section 11 claims. Complaint ¶ 146. Defendants argue that Plaintiffs' Section 14(a) claims should be dismissed because they fail to plead facts establishing negligence, because the claims sound in fraud and fail to comply with Rule 9(b), and because they fail to allege any actionable misstatements.

■■■■ Section 14(a) of the Securities Exchange Act authorizes the Securities and Exchange Commission ("SEC") to promulgate rules for the solicitation of proxies and prohibits violations of those rules. *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1086, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991). SEC Rule 14a–9 prohibits the solicitation of proxies by means of materially false or misleading statements or omissions. 17 C.F.R. § 240.14a–9. In order to state a claim for a violation of Rule 14a–9, the plaintiff must allege facts establishing the following elements "(1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *In re Marsh & McLennan Companies, Inc. Sec. Lit.*, 536 F.Supp.2d 313, 320–21 (S.D.N.Y. 2007). "Omission of information from a proxy statement will violate Section 14(a) and Rule 14a–9 if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Id.* at 321 (internal brackets omitted).

The Court has already addressed *supra* at 705–07, whether the complaint alleges any material misstatements or omissions. Those same rulings apply as well to Plaintiffs' Section 14(a) claims. Similarly, the Court has already addressed whether the alleged misstatements and omissions sound in fraud and must be pled with particularity. Accordingly, Defendants' motion to dismiss Plaintiffs' Section 14(a) claim is well-taken and is **GRANTED** to the extent Plaintiffs' Section 11 claims have been dismissed.

9. *Section 20(a) Claims for Control Person Liability*

■■■ The First Charter sub-class also asserts claims for control person liability against the Individual Defendants for the alleged Section 14(a) violations. Like Section 15, controlling person liability under Section 20(a) for violations of Section 14(a) is derivative. *In re Affiliated Computer Serv. Deriv. Lit.*, 540 F.Supp.2d 695, 704 (N.D.Tex.2007). Accordingly, to the extent the Court has dismissed Plaintiffs' Section 14(a) claims, Defendants' motion to dismiss the corresponding Section 20(a) claims is well-taken and that claim is dismissed as well. Otherwise, the motion to dismiss is not well-taken and is **DENIED.**

B. *Securities Exchange Act Violations*

The overwhelming bulk of the complaint is devoted to the claims of the Fifth Third sub-class arising under Section 10(b) of the Securities Exchange Act and SEC Rule 10b–5, although the First Charter sub-class also has claims arising under Sections 14 and 20(a) of the Act. The Court starts, however, by analyzing Defendants' motion to dismiss Plaintiff's Section 10(b) claims.

1. *Section 10(b) of the Securities Exchange Act and SEC Rule 10b–5*

The complaint alleges that Fifth Third and the Individual Defendants violated

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5. Section 10(b) and Rule 10b–5 both prohibit making fraudulent, material misstatements or omissions in connection with the purchase or sale of a security. *PR Diamonds,* 364 F.3d at 681–82. In order to state a claim for a violation of these provisions, "a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Id.* at 681 (quoting *In re Comshare, Inc. Secs. Lit.,* 183 F.3d 542, 548 (6th Cir.1999)). Section 10(b) and Rule 10b–5 claims are also subject to the heightened pleading requirements of the PSLRA. Thus, in addition to pleading fraud claims with particularity as required by Fed. R.Civ.P. 9(b), the PSLRA also requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* (quoting 15 U.S.C. § 78u–4(b)(1)). Additionally, the PSLRA requires that the facts pled in the complaint must give rise to "a strong inference of scienter." *Id.* (citing 15 U.S.C. § 78u–4(b)(2)). A complaint is subject to dismissal on motion of any defendant if the complaint fails to meet this requirement. *Id.*

Defendants' motion raises three grounds for dismissing Plaintiffs' Section 10(b) and Rule 10b–5 claims. First, Defendants contend that the complaint fails to identify any actionable misstatements or omissions. Second, Defendants argue that the complaint fails to raise a strong inference of scienter. Third, Defendants argue that the complaint fails to show loss causation. The Court has more or less addressed the issues of materiality and loss causation in the preceding sections.[7] *See supra,* at 705–08, 710–11. Accordingly, the Court will focus here on the issue of scienter. Moreover, as further explained, since the complaint fails to establish a strong inference of scienter, the Court need not address the issues of materiality and loss causation as they pertain to Plaintiffs' Section 10(b) and Rule 10b–5 claims.

### a. *Scienter*

Scienter, as the Court has already stated, is a state of mind indicating intent to defraud. In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), the Court explained how to determine whether the complaint meets the PSLRA's scienter requirement:

> It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, as the Seventh Circuit did, but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be more than

---

7. The Court notes that, in comparison to the Section 11 and 12 Securities Act claims, loss causation is an element of Section 10(b) and Rule 10b–5 claims that must be adequately pled. *Brown v. Earthboard Sports USA, Inc.,* 481 F.3d 901, 917 (6th Cir.2007); *D.E. & J Ltd. P'ship v. Conaway,* 284 F.Supp.2d 719, 749 (E.D.Mich.2003).

merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. *Id.* at 314, 127 S.Ct. 2499. In *Helwig v. Vencor, Inc.,* 251 F.3d 540 (6th Cir.2001), the Sixth Circuit provided a non-exhaustive list of factors trial courts should consider when determining whether the complaint adequately pleads facts showing scienter:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Id.* at 552 (*overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). In considering whether scienter has been adequately pled, the relevant question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322–22, 127 S.Ct. 2499.

Before addressing Defendants' specific arguments concerning scienter, the Court notes that nowhere does the complaint allege insider trading, a divergence between internal reports and external statements, bribery, quick settlement of lawsuits, deceptive disclosures of negative accounting information, or interested directors concealing impending sales of stock. The complete absence of six of the nine *Helwig* factors, particularly the lack insider trading, suggests that the complaint faces an uphill climb to establish that any of the Defendants acted with scienter. *See PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 691 (6th Cir.2004) (absence of insider trading works against an inference of scienter).

Defendants' general contention that the complaint fails to sufficiently allege scienter in turns raises a number of sub-arguments or issues. Defendants argue further that: 1) the most compelling inference is that Fifth Third, along with may other financial institutions, was a victim of the global economic crisis; 2) Plaintiffs' may not rely on "group pleading" to establish scienter; 3) the complaint fails to adequately allege that Defendants had a motive and opportunity to commit securities fraud; 4) the complaint fails to demonstrate conscious or reckless misbehavior by any Defendant; 5) scienter cannot be established by signing a public disclosure; and 6) Plaintiffs' miscellaneous remaining allegations fail to establish scienter.

#### i. *Global Economic Crisis*

Defendants argue that the most plausible inference from the complaint is that they failed to predict the severity of the global economic downturn that began near the end 2007. Defendants attached to their motions a number of news articles and reports which were the subject of Plaintiffs' motion to strike. As indicated, Plaintiffs' do not object to the Court taking judicial notice that there was an economic

downturn; they do, however, object to the Court taking judicial notice of specifics about the downturn, such as its cause, its magnitude, and its impact. Fifth Third's degree of exposure to the sub-prime lending market and its subsequent collapse is of course the entire context of Plaintiffs' complaint. The Court, however, need not conclusively determine whether the global economic crisis is the most plausible inference to be drawn from the complaint. As the Court discusses further below, the complaint considered as a whole otherwise fails to establish the requisite strong inference of scienter. Moreover, the strongest inference to be drawn from the complaint is that Defendants simply mismanaged Fifth Third, which is insufficient to establish scienter.

ii. *Group Pleading*

■■■ Defendants next argue that Plaintiffs may not rely on "group pleading" to establish that they acted with scienter. "Under the group pleading doctrine, the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents, such as Annual Reports, prospectuses, registration statements, press releases, or other 'group published information' that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation." *Durgin v. Mon,* 659 F.Supp.2d 1240, 1253 (S.D.Fla.2009). Defendants contend that the PSLRA abolished group pleading and that, therefore, the complaint must allege particular facts to establish each Defendant's scienter. In response, Plaintiffs do not deny that they rely on group pleading, at least in part, to establish scienter but they contend that some courts have allowed it post-PSLRA and, in any event, that there is no binding Sixth Circuit opinion prohibiting group pleading. Plaintiffs further contend, however, that the complaint contains sufficient factual allegations

to give rise to a strong inference of scienter as to each of the Individual Defendants.

The Sixth Circuit has not decided whether group pleading survives the enactment of the PSLRA. There are divergent opinions among the district courts of the Sixth Circuit about the continued viability of group pleading and, moreover, they even appear to disagree as to which position represents the majority opinion within the Circuit. *Compare In re First-Energy Corp. Sec. Lit.,* 316 F.Supp.2d 581, 599 (N.D.Ohio 2004) (finding that an "overwhelming majority" of district courts within the Sixth Circuit allow group pleading in post-PSLRA cases), *with D.E. & J Ltd. P'ship v. Conaway,* 284 F.Supp.2d 719, 731 n. 12 (E.D.Mich.2003) (district courts still allowing group pleading have done so without explanation or relied on pre-PSLRA authority). More recently, however, Judge Rice has concluded that group pleading is "antithetical" to the PSLRA's requirement that the complaint state with particularity facts giving rise to a strong inference of scienter. *In re Huffy Corp. Sec. Lit.,* 577 F.Supp.2d 968, 984–87 (S.D.Ohio 2008).

This Court agrees with Judge Rice that group pleading, if it properly existed in the Sixth Circuit before, does not survive the PSLRA. The PSLRA requires the complaint to state "with particularity facts giving rise to a strong inference that *the defendant* acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(emphasis added). As Judge Rice point out in *Huffy Corp.,* use of the phrase "the defendant" can only be understood to mean each defendant in a multiple-defendant case because "it is inconceivable that Congress intended liability of any defendants to depend on whether they all were sued in a single action or were each sued alone in several separate actions." 577 F.Supp.2d

at 984 (quoting *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 364–65 (5th Cir.2004)). Moreover, a plain reading of the statute indicates that the use of "the defendant" in the context of the requirement to plead scienter with particularly can only mean that the complaint must plead scienter with particularity as to each defendant in the case. *Tran v. Gonzales,* 447 F.3d 937, 940–41 (6th Cir.2006) ("In all cases of statutory construction, the starting point is the language employed by Congress. Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms."). Group pleading, dispensing as it does with the need to identify the individual responsible for the alleged misstatement or omission, conflicts with the PSLRA's requirement to plead scienter with particularity as to "the defendant."

Accordingly, Plaintiffs cannot rely on group pleading to establish that the Individual Defendants acted with scienter.

### iii. *Motive and Opportunity to Commit Securities Fraud*

Defendants next argue that the complaint inadequately pleads a motive and opportunity to commit securities fraud. Defendants argue that in attempting to establish scienter the complaint relies on motives common to all corporations and executives generally, such as a desire to secure lucrative bonuses and stock options, but fails to plead facts demonstrating a motive to commit fraud.

In *PR Diamonds,* the Court held that in order to demonstrate motive, the complaint "must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." 364 F.3d at 690. Moreover, Defendants correctly argue that the complaint must allege motives to commit fraud as opposed to motives common to corporations and executives generally. Thus, some motives, are insufficient as a

matter of law to establish scienter, such as a desire for the company to appear successful and an executive's desire to protect his position in the company and increase his compensation. *Id.*

Consequently, in light of *PR Diamonds,* several of the complaint's allegations fail to establish motive to commit securities fraud as a matter of law. Most obviously, the complaint's allegations that the Individual Defendants were motivated to commit fraud in order to secure lucrative bonuses, stock and stock options fail because they relate to the general desire of an executive to increase his compensation. Complaint ¶¶ 466–71.

The complaint also alleges that Defendants were motivated to commit securities fraud to lower the cost of borrowing on notes Fifth Third issued during the class period and to inflate the cost of Fifth Third stock to fund future acquisitions, such as the First Charter merger. Complaint ¶¶ 465(a)–465(b). In *PR Diamonds,* the Court held that the allegation that the defendants were motivated to engage in fraud to forestall the company's default on a loan and to preserve its line of credit was suggestive of scienter, but alone did not establish a strong inference. 364 F.3d at 690. In *Ley v. Visteon Corp.,* 543 F.3d 801 (6th Cir.2008), however, the Court appeared to retreat from or at least limit that aspect of *PR Diamonds* by stating that the complaint must still provide particularized allegations concerning the credit facility to distinguish it from an ordinary business motive and to support an inference of fraud. *Id.* at 813–14. In this case, although the complaint recites the rates at which Fifth Third issued its notes, it fails to explain why there is a connection between the alleged inflated price of Fifth Third stock and the interest rates of its corporate notes or what rates Fifth Third might have had to have pay on its notes

had its stock not been artificially inflated. Thus, there are no allegations from which to infer that Defendants had anything other than an ordinary business motive to reduce the cost of borrowing to Fifth Third. *See Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 544 (5th Cir.2008) (defendants' desire to maintain company's credit rating universal to all corporate executives). Similarly, the complaint's allegations that Defendants wanted to inflate the price of Fifth Third stock to reduce the cost of future acquisitions are insufficient to find a motive to commit fraud. *Darby v. Century Business Serv., Inc.*, 96 Fed. Appx. 277, 282–83 (6th Cir.2004); *In re Century Business Serv. Sec. Lit.*, No. 1:99CV02200, 2002 WL 32254513, at *7 (N.D.Ohio June 27, 2002).

Thus, Plaintiffs' motive and opportunity allegations fail to support an inference of scienter.

### iv. *Conscious or Reckless Conduct*

Defendants next argue that the complaint fails to allege facts showing conscious misbehavior or recklessness on their part. This argument addresses the complaint's reliance on confidential witnesses, Defendants' access to reports and information concerning the composition of Fifth Third's loan portfolio, the imputation of knowledge based on their positions, and participation on internal committees, to establish scienter.

### v. *Confidential Witnesses*

The complaint cites twelve confidential witnesses to support Plaintiffs' contention that Fifth Third abandoned its conservative lending standards in order to boost revenue through risky loan origination. Complaint ¶¶ 288–341. The allegations of these confidential witnesses occupy twenty pages of the complaint, but in general they recount that Fifth Third became a *de facto* subprime lender, waived lending standards, enforced sales quotas, and manipulated the loan loss reserves to conform earnings to targets.

Confidential witnesses may assist securities fraud plaintiffs establish scienter so long as they are not vague and conclusory. *Ley*, 543 F.3d at 811. In other words, the confidential witnesses must provide enough information to establish their basis of knowledge of the alleged misconduct ("what, when, where, and how") and they must establish that the defendants were aware of the misconduct. *Id.; Konkol v. Diebold, Inc.*, 590 F.3d 390, 400–01 (6th Cir.2009) (stating that "generalized statements cannot substitute for specific facts through which a factfinder can strongly infer that the Defendants themselves knew of or recklessly disregarded the falsity of the earnings statements, especially because the majority of the Confidential Witnesses are not identified as having any contact or interaction with any of the Defendants."); *Frank*, 649 F.Supp.2d at 747–48. Allegations that the defendant "must have known" about the misconduct due to his position are insufficient to establish scienter. *Frank*, 649 F.Supp.2d at 747–48.

Assuming without deciding that the complaint sufficiently establishes each confidential witness's basis of knowledge, there are no facts alleged from which it can be inferred that the confidential witness had sufficient contact with any of the Defendants to impute their knowledge of misconduct to the Defendants. *In re Metawave Comm. Corp. Sec. Lit.*, 629 F.Supp.2d 1207, 1217 (W.D.Wash.2009) (finding confidential witnesses failed to establish scienter where they did not connect their knowledge of product defects to the defendants); *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F.Supp.2d 1267, 1289 (S.D.Fla.2008) (confidential witnesses did not establish scienter because they failed to connect vice president of lending's disregard of lending guidelines to the defen-

dants); *Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 141 (D.Conn.2007) (confidential witnesses failed to establish scienter where they did not report accounting deficiencies to defendants).

CW–1 was a vice president for mortgage compliance in Fifth Third's Cincinnati headquarters from 2004 until November 2007. He says that he attended monthly risk management meetings with "senior officers" from the compliance, quality control, and underwriting departments. CW–1 states that these meetings generated reports detailing the kinds and types of loans generated, the amount of reserves, and delinquencies. These reports were distributed upwards to Fifth Third's "most senior leadership," including Defendant Kabat. CW–1 says that these meetings established that Fifth Third was engaged in subprime lending and that the compliance department was concerned about the risky loans Fifth Third was generating. Finally, CW–1 alleges that "when the economy started to turn in early 2007, Fifth Third executives began to increase the pressure on loan officers to close deals." Complaint ¶¶ 290–91. Although CW–1 reports facts showing that Fifth Third was engaging in subprime lending, that there were reports confirming this fact, and that there was concern in some departments about Fifth Third's lending practices, he does not connect any of this information to any of the Individual Defendants. CW–1 does not allege that he met with or reported any of these problems to the Defendants. Indeed, CW–1 does not even mention Defendants Marshall and Poston and his only allegation concerning Defendant Kabat is that monthly reports were distributed to him. Scienter, however, cannot be inferred from the mere fact that the defendant had access to information. *PR Diamonds*, 364 F.3d at 687–88.

CW–2 was an underwriting supervisor for Fifth Third from 2003 to March 2007. CW–2 also reports that Fifth Third disregarded its lending standards and originated subprime loans. CW–2 also recounts that Fifth Third imposed strict sales quotas and that managers often overrode underwriters' rejections of loans. CW–2 also states that he attended a meeting in Florida in 2006 in which Defendants Kabat and Marshall discussed lending guidelines. After Kabat and Marshall left the room, John McGinty, the head of mortgage operations in Florida, told the attendees that he had authority to override the guidelines. Complaint ¶¶ 292–96. CW–2, however, fails to establish scienter. First, all of CW–2's information pre-dates the class period and, thus, is irrelevant. *Malin*, 499 F.Supp.2d at 141–42 (scienter not established where confidential witnesses left the company prior to the start of the class period). Second, CW–2 makes no mention at all of Defendant Poston. Third, CW–2's only mention of Defendants Kabat and Marshall is that they apparently emphasized Fifth Third's lending guidelines and that *after* they were gone, another executive stated that the guidelines could be waived or overridden. None of CW–2's allegations imputes knowledge of Fifth Third's deficient lending practices to the Individual Defendants. Accordingly, CW–2's allegations fail to establish scienter.

CW–3, a retail mortgage underwriter in Florida from 2004 to September 2008 provides the most comprehensive set of allegations concerning Fifth Third's alleged subprime lending practices, and pressures and incentives to generate those loans, complaint ¶¶ 297–307, and yet he too fails to connect any of his knowledge of this activity to the Individual Defendants. CW–3 attributes all of this activity to John McGinty, who is not a defendant in the case, or to "executive management in Cincinnati." CW–3's allegations fail to establish scienter.

CW–4 was a sales executive in Florida from November 2006 to July 2008 and was responsible for jumbo construction loans. CW–4 discusses Fifth Third's poor underwriting and appraisal processes. CW–4 states that decisions approving builder and developer loans were made "at a very high level in the Company." Complaint ¶¶ 308–11. None of CW–4's information relates to the Individual Defendants nor are there any allegations that CW–4 informed the Individual Defendants about this activity. Accordingly, CW–4's allegations fail to establish scienter.

CW–5 was vice president of operations of Fifth Third's Ft. Myers office from early 2005 to mid–2007. CW–5 relates the alleged pressure to generate new loans and the loosening or waiving of approval guidelines to meet quotas. Complaint ¶¶ 312–15. Like CW–3, however, CW–5's information predates the class period. Additionally, like the other confidential witnesses, CW–5 attributes the quotas to unidentified "Fifth Third executives in Cincinnati" but fails to detail the Individual Defendants' knowledge of or participation in this activity. Therefore, CW–5's allegations fail to establish scienter.

CW–6 was a wholesale account executive who worked in North Carolina from mid–2006 to February 2007. CW–6 also reports on the pressure to generate sales and the malleability of Fifth Third's lending guidelines. Complaint ¶¶ 316–18. CW–6's information, however, pre-dates the class period and does not connect his knowledge to the Individual Defendants. Thus, CW–6's allegations fail to establish scienter.

CW–7 was a senior compliance specialist who worked in the Cleveland hub from October 2007 to October 2008. CW–7 says that Fifth Third was making documentation and stated income loans until late 2007 and 100% LTV loans until early 2008. Complaint ¶ 319. CW–7's allegations,

however, do not establish scienter because there are no allegations connecting this information to the Individual Defendants.

CW–8 claims that from 2006 to December 2007, his job was to find new customers with low to moderate incomes and that Fifth Third approved stated income and no documentation loans. CW–8 also reports the need to find loopholes to get loans approved for high risk borrowers and the intense sales pressure. Complaint ¶ 320. CW–8's allegations, however, do not establish scienter because there are no allegations connecting this information to the Individual Defendants.

CW–9 was a vice president and outside origination manager for Fifth Third in Naples, Florida from 1996 to mid–2007. CW–9 also reports the pressure to generate risky loans. He also states that Fifth Third used a computer program to track mortgages called "ACAPS." CW–9 alleges that senior management, including the Individual Defendants, could access ACAPS to track sales data and performance. ACAPS also flagged documentation that was missing from mortgage applications to remind the sales persons and underwriters to obtain the missing documentation. Complaint ¶¶ 321–27. Although CW–9 finally is a witness who makes specific allegations concerning the Individual Defendants, the only allegation is that they had access to information concerning loans being generated. As previously stated, however, the fact that the Individual Defendants had access to ACAPS does not establish scienter. CW–9 fails to proffer any other facts connecting his information to the Individual Defendants. Accordingly, CW–9's allegations fail to establish scienter.

CW–10 also recounts how Fifth Third generated and approved subprime loans in Michigan, but he too fails to connect this information to the Individual Defendants.

Complaint ¶¶ 328–33. Accordingly, CW–10's allegations fail to establish scienter.

CW–11 was a vice president and regional manager for Fifth Third's retail division in Florida from May 2006 to February 2008. He also discusses sales quotas and pressure from "corporate headquarters" and "senior management" in Cincinnati, and disregard of lending guidelines. CW–11 also claims that by February 2008, defaults had become such a problem that "senior management" decided to book them on the branch balance sheets rather than the mortgage department in order to conceal the full extent of the problem. Complaint ¶¶ 334–39. CW–11's allegations fail to establish scienter, however, because he does not connect any of this activity to the Individual Defendants.

Finally, CW–12 states that he was the performance reporting manager for Fifth Third's mortgage department from 2000 to 2006. CW–12 claims that during this time, "the CEO and CFO of the Company" would discuss whether Fifth Third's earnings were tracking projections, and, if not, the CFO would direct CW–12 to reduce the loan loss reserves until earnings met the projections. Complaint ¶¶ 340–41. CW–12's allegations fail, like others before him, because his information pre-dates the class period. Moreover, CW–12 does not identify the CEO or the CFO and, since they are unidentified, presumably they were not Defendants Kabat and Marshall. Therefore, CW–12 fails to connect this alleged misconduct to the Individual Defendants. Accordingly, CW–12's allegations fail to establish scienter.

In summary, for the foregoing reasons, the confidential witnesses fail to establish scienter.

### vi. *Accounting Violations*

The complaint alleges that Fifth Third violated Generally Accepted Accounting Principles ("GAAP") and Financial Accounting Standards ("FAS") concerning setting aside reserves for potential credit losses. Complaint ¶¶ 345–55. Accounting violations, "standing alone, do not create an inference of scienter, much less a strong one." *PR Diamonds*, 364 F.3d at 694. If, however, the accounting errors are "sufficiently basic and large, their existence, in combination with other factors, may support the requisite scienter inference." *Id.* In order to establish scienter based on accounting violations, the Sixth Circuit has indicated that the complaint must allege "extreme 'in your face facts' that 'cry out' scienter." *Konkol*, 590 F.3d at 399.

In this case, Fifth Third's alleged GAAP and FAS violations concerning loan loss reserves fail to establish scienter. The complaint gives no indication as to the magnitude of these errors or by how much income was overstated as a result of the errors. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 536 (5th Cir.2008) (complaint failed to plead scienter based on GAAP violations where there was no estimate on how much earnings were overstated). Significantly, nowhere does the complaint indicate that Fifth Third was required to restate its financial statements because of accounting errors. *In re The Goodyear Tire & Rubber Co. Sec. Lit.*, 436 F.Supp.2d 873, 893 (N.D.Ohio 2006) (noting that "accounting irregularities" that required company to restate earnings do not automatically establish scienter); *In re Credit Acceptance Corp. Sec. Lit.*, 50 F.Supp.2d 662, 680 (E.D.Mich.1999) (accounting errors concerning loan loss reserves did not establish scienter where none of the financial statements issued during class period had to be restated). Moreover, accounting for loan loss reserves is not the sort of simple accounting concept the violation of which creates an inference of scienter. The Sixth Circuit has observed that FAS 5, which addresses

loss contingencies, "does not specify the level of probability required to accrue a loss." *Miller v. Champion Ent.*, 346 F.3d 660, 689 (6th Cir.2003). In *In re Countrywide Financial Corp. Deriv. Lit.*, 554 F.Supp.2d 1044, 1070 (C.D.Cal.2008), the court noted that "setting loan loss reserves involves a great deal of discretion." In *United States v. Morris*, 80 F.3d 1151, 1164 (7th Cir.1996), a mail and wire fraud prosecution, the Seventh Circuit commented that "the estimation of probable losses in a large loan portfolio ... is more an art than a science[.]" Indeed, the complaint cites at least five different standards or accounting authorities that address accounting for loss contingencies, most of which in turn contain numerous subparts or considerations. The *Audit Accounting Guide*, for example, provides six elements for effective credit loss estimating which also come with five separate cautions or warnings in applying those elements. Complaint ¶¶ 351–52. The SEC Staff Bulletin lists eleven different considerations in estimating loan loss provisions. *Id.* ¶ 353. Guidance from other federal regulatory agencies, such as the Office of the Comptroller of Currency, provides nine different factors for estimating loan losses. *Id.* ¶ 354. In other words, even the complaint has to admit that estimating and setting aside appropriate loan loss reserves is a complicated accounting function.

Accordingly, the Court concludes that Fifth Third's alleged accounting errors were not basic, and because Plaintiffs have not alleged any facts concerning the magnitude of the alleged accounting violations, the alleged violations do not create a strong inference of scienter.

### vii. *Sarbanes–Oxley Certifications*

██ Defendants also argue that scienter is not established because they signed certifications required by the Sarbanes–Oxley Act. Generally speaking, the Sar-banes–Oxley Act requires executives who sign reports with the SEC to certify that they have reviewed the report and that it does not contain any untrue material misstatements or omissions. 15 U.S.C. § 7241(a). "[A] Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Ley*, 543 F.3d at 812 (internal quotation marks omitted). In order for a Sarbanes–Oxley certification to establish scienter, the complaint must allege facts demonstrating that the defendant knew or should have known that the report contained false statements. *Konkol v. Diebold, Inc.*, 590 F.3d 390, 402–03 (6th Cir.2009).

As the Court's discussion of the confidential witnesses demonstrates, the complaint fails to connect up the alleged errors in financial statements and reports with the Individual Defendants. Moreover, the fact that Fifth Third was not required to restate in financial statements indicates that their Sarbanes–Oxley certifications are not probative of scienter. *See, e.g., Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266–67 (11th Cir.2006) (accounting irregularities must be glaring for Sar-banes–Oxley certification to create inference of scienter); *Frank v. Dana Corp.*, 649 F.Supp.2d 729, 742 (N.D.Ohio 2009) (same); *In re Dell Inc., Sec. Lit.*, 591 F.Supp.2d 877, 896 (W.D.Tex.2008) (Sar-banes–Oxley certifications did not raise inference of scienter where accounting error had only small impact on net income). Therefore, the complaint's allegations concerning Defendants' Sarbanes–Oxley certifications fail to establish scienter

### viii. *Access to Reports/Service on Committees/Executive Positions*

The complaint also attempts to establish scienter through Defendants' access to in-

formation concerning Fifth Third's loan portfolio, such as the ACAPS system, as well as their service on internal committees whose function was to review credit quality. The complaint also relies on Defendants' positions as executives of Fifth Third to establish scienter.

█ Scienter, however, cannot be inferred merely because of the defendants' positions in the company or the fact that they had access to the company's financial information. *PR Diamonds,* 364 F.3d at 688. Instead, "the [c]omplaint must allege specific facts and circumstances suggestive of their knowledge." *Id.* Specifically, the complaint must contain "detailed facts regarding the financial reports, how they were used, and their connection to the defendants." *Konkol,* 590 F.3d at 397. Moreover, without more, allegations that the defendants participated in committee meetings to discuss the company's financial information do not establish a strong inference of scienter. *Id.* at 398.

In this case, concerning financial information, it is clear that the complaint relies only on the fact of Defendants' access to such data to establish a strong inference of scienter. *See* Complaint ¶¶ 465(g)-(k). Most tellingly, the complaint alleges that "[s]ince Defendants Kabat and Marshall had all of the relevant information regarding underwriting and credit quality at their fingertips through ACAPS, they either knew or were reckless in not knowing that the poor credit quality of the loans the Company had been originating and the poor credit quality of the loan portfolio were the sources of non-performing assets and not general economic conditions[.]" Complaint ¶ 465(k). There are no factual allegations, however, that Defendants actually read or reviewed information available on the ACAPS system and that their review of the available information was sufficiently comprehensive to appreciate the alleged precarious quality of Fifth Third's loan portfolio. Since the complaint relies entirely on Defendants' mere access to financial data, these allegations fail to support a strong inference of scienter.

Plaintiffs also rely heavily on Defendants' establishment of and service on the Corporate Credit Committee. The complaint notes that the purpose of the committee was to ensure that senior executives were focused on credit quality. *Id.* ¶ 465(c). The complaint also relies on statements made by Kabat and Marshall that credit reviews of Fifth Third's loan portfolio had recently been performed. *Id.* ¶¶ 465(*l* ), (r). However, the complaint fails to allege that the credit review raised red flags from which the Defendants knew or should have know that the credit quality of Fifth Third's loan portfolio was deteriorating. *See PR Diamonds,* 364 F.3d at 686–87 ("Courts typically look for multiple, obvious red flags before drawing an inference that a defendant acted intentionally or recklessly."); *Ley,* 543 F.3d at 817 (complaint must identify specific red flags to create a strong inference of scienter). Indeed, as Defendants point out in their reply brief, the complaint indicates just the opposition-review of the loan portfolio did not raise any red flags to Defendants. *E.g.,* Complaint ¶ 224 ("We had an ongoing effort there, but the review that we just went through didn't result in any need to change any of our treatment of any of those portfolios.") (statement of Defendant Marshall in July 23, 2007 *Watch List* article). The complaint's allegations that Defendants should have known of the deteriorating status of Fifth Third's loan portfolio simply from their review of it and their service on committees is tantamount to an allegation of fraud by hindsight and thus is insufficient to establish scienter.

ix. *Summary of Scienter Allegations*

Viewing the complaint its entirety, as *Tellabs* requires, the Court is persuaded

that Plaintiffs have failed to demonstrate the strong inference of scienter mandated by the PSLRA. As the Court commented at the outset of its scienter analysis, while not dispositive, the complaint really makes no attempt to establish any of the *Helwig* factors. This somewhat gaping omission, especially the failure to allege that insider trading occurred, goes a long way towards concluding that a strong inference of scienter has not been pled. The complaint has not pled that the Defendants had any special motive or opportunity to commit securities fraud. Plaintiffs' numerous confidential witnesses fail to connect the Defendants with the alleged misconduct they report in their allegations. The accounting principles concerning loan loss reserves are anything but basic. The Sarbanes–Oxley certifications are not probative of scienter. Plaintiffs' reliance on group pleading undercuts an inference that the Individual Defendants acted with scienter.

Also cutting strongly against a finding of scienter is the fact that much of the information that Plaintiffs claim was concealed was actually reported. For instance, while the complaint alleges that Fifth Third was originating loans to borrowers with subprime-equivalent FICO scores, Fifth Third in fact disclosed in several 8–K filings the FICO and Alt–A composition of its loan portfolio. Fifth Third also reported the LTV ratio of its portfolio in several 8–K filings. The complaint never alleges that the figures reported by Fifth Third were false or inaccurate. Moreover, the fact that Fifth Third was engaged in Alt–A lending at all should have been a red flag to any investor who was concerned about credit quality because by definition documentation supporting the creditworthiness of these borrowers was lacking. Fifth Third continually reported increases in non-performing assets throughout the class period and the complaint admits that Fifth Third actually increased its loan loss reserves during this time. Plaintiffs complain that Fifth Third misled investors because it actually decreased its reserves as a percentage of non-performing assets throughout the class period but this phenomenon was specifically noted by one of the analysts in the April 22, 2008 conference call. Complaint ¶ 429. Thus, the information was actually disclosed and available if percentage of reserves to non-performing assets was truly important to investors. Plaintiffs complain that Fifth Third should have recognized loans delinquent for 30 to 89 days as non-performing and set aside reserves accordingly, and yet none of the accounting authorities they cite required Fifth Third to account for delinquent loans in this manner.

*Tellabs* requires the inference of scienter to be "at least as compelling" as any other inference. Defendants contend that the most compelling inference to be drawn from the complaint is that Fifth Third, along with many other financial institutions, was overwhelmed by the magnitude of the collapse of the credit market. While Plaintiffs dispute Defendants' use of extraneous materials to establish the size and impact of this event, even the complaint admits that as early as 2006, there were "many indicators pointing to significant problems in subprime mortgage performance." Complaint ¶ 9. Thus, the complaint itself supports the inference that the decline in the macro-credit market, as Defendants Kabat and Marshall stated in several conference calls, and not fraud, is the reason behind the decline in Fifth Third's share value.

Even if the collapse of the credit market is not the strongest inference to be drawn from the complaint, another equally compelling inference is that Fifth Third simply made a lot of risky loans and failed to estimate loan loss reserves accurately. The worst this establishes, however, is that

Defendants mismanaged Fifth Third. Mismanagement of the company does not establish scienter. *Auslender v. Energy Mmgt. Corp.*, 832 F.2d 354, 357 (6th Cir. 1987); *Ciresi v. Citicorp*, 782 F.Supp. 819, 821 (S.D.N.Y.1991) ("In any event, the claim that the defendants did not plan their loan reserves properly is essentially a claim that defendants mismanaged the company. Even if well-pled, allegations of mismanagement are not actionable under section 10(b) of the federal securities laws.")

Accordingly, for all of the above reasons, Defendants' motion to dismiss Plaintiffs' Section 10(b) and Rule 10b–5 claims is well-taken and is **GRANTED.**

### C. *Control Person Liability*

Like Section 15 of the Securities Act, Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a), imposes liability for securities violations on "control persons." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 696 (6th Cir.2004). Section 20(a) ... establishes two requirements for a finding of control person liability. First, the "controlled person" must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder. Second, the "controlling person" defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the securities law violation. "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.* at 696–97 (quoting in part 17 C.F.R. § 230.405). Where, as in this case, however, the Court has dismissed the underlying Section 10(b) claims, it must also dismiss the Section 20 claims because there is no underlying securities violation. *PR Diamonds*, 364 F.3d at 697–98; *Omnicare*, 583 F.3d at 947.

Accordingly, Defendants' motion to dismiss Plaintiffs' Section 20 claims is well-taken and is **GRANTED.**

### *Conclusion/Summary*

In conclusion, Defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART.** The motion is well-taken and is **GRANTED** as to the following claims:

1. Plaintiffs' Section 11, Section 12, and Section 14(a) claims to the extent they relate to alleged misstatements and omissions concerning:

 a. sales quotas, incentives, and bonuses to increase new loan originations;

 b. Fifth Third's Alt–A loan portfolio being similar to a sub-prime portfolio;

 c. Fifth Third's Alt–A loan portfolio having "layered risk factors";

 d. marketing high loan-to-value loans;

 e. marketing real estate loans to European borrowers;

 f. Fifth Third's inability to sell loans on the secondary market;

 g. failure to identify non-performing loans;

 h. overstatement of income;

 i. the forward-looking statements discussed *infra*, at 708–09.

2. The Section 12(b)(2) claims of the Preferred B sub-class;

3. The Section 12(b)(2) claims of the Preferred C sub-class, except as to Defendant UBS Securities, Inc;

4. The Section 15 and Section 20 claims of the First Charter sub-class, the Preferred B sub-class, and the Preferred C subclass to the extent the Court has dismissed the corresponding Section 11, Section 12, and Section 14(a) claims;

5. The Section 10(b) and Rule 10b–5 claims of the Fifth Third Sub-class;

6. The Section 20 claims of the Fifth Third sub-class.

Defendants' motions to dismiss are not well-taken and are **DENIED** as to the remaining claims, which in light of the foregoing, are as follows:

1. The Section 11 claims of the First Charter subclass, Preferred B sub-class, and Preferred C sub-class and the Section 14(a) claims of the First Charter sub-class concerning:

 a. the consideration paid for First Charter shares in the merger;

 b. the alleged deteriorating quality of Fifth Third's loan portfolio;

 c. deterioration in Tier 1 capital;

 d. failure to disclose the need to raise additional capital.

2. The corresponding Section 15 claims of the First Charter sub-class, Preferred B sub-class, and Preferred C sub-class, and the Section 20 claims of the First Charter sub-class.

## X. Underwriter Defendants' Supplemental Motion to Dismiss & Plaintiffs' Motion for Leave to File Amended Consolidated Class Action Complaint

Defendants' filed an omnibus motion to dismiss (Doc. No. 78) and in conjunction with that pleading the Underwriter Defendants filed a supplemental motion to dismiss (Doc. No. 79) in which they highlighted that the complaint only asserts claims against them pursuant to Section 12(a)(2) on behalf of the Preferred B and Preferred C sub-classes. Indeed, their memorandum specifically states that "[t]here are no claims against the Underwriter Defendants under Section 11 of the Securities Act[.]" Doc. No. 79, at 2. Upon reading the supplemental motion to dismiss, Plaintiffs moved to amend the complaint on the grounds that through a scrivener's error, they omitted to name the Underwriter Defendants in their Section 11 claims. Plaintiffs, however, believe that, fairly read, the existing complaint asserts Section 11 claims against the Underwriter Defendants, and, thus, an amended complaint is not strictly necessary. In that regard, Plaintiffs' note that paragraphs 5 and 6 of the complaint specifically name the Underwriter Defendants as defendants for the Preferred B and Preferred C sub-classes.

The Underwriter Defendants' oppose Plaintiffs' motion for leave to amend. They contend that Plaintiffs' decision not to assert Section 11 claims against them was strategic and that they only moved for leave to amend when it became apparent that their Section 12(a)(2) claims are subject to dismissal on standing grounds. In any event, the Underwriter Defendants argue that Plaintiffs' motion for leave to amend is moot because their Section 11 claims were subject to dismissal based on the grounds advanced in the omnibus motion to dismiss.

On review of the complaint, and construing the pleadings so as to do substantial justice, Fed.R.Civ.P. 8(e), the Court agrees with Plaintiffs that, fairly read, the complaint names the Underwriter Defendants as Defendants as to their Section 11 claims. Moreover, the Court finds it difficult to arrive at the conclusion that, having asserted Section 11 claims against the Underwriter Defendants before the various lawsuits were consolidated, they omitted those claims against the Underwriters in the consolidated complaint for strategic reasons. Accordingly, Plaintiffs' motion for leave to file an amended consolidated class action complaint is **MOOT.** Nevertheless, the Court's previous rulings on Defendants' omnibus motion to dismiss Plaintiff's Section 11 claims apply equally to the Underwriter Defendants for the reasons stated.

## XI. Motion to File Sur-reply Brief

Finally, Plaintiffs have filed a motion to file a sur-reply brief in response to the

Sixth Circuit's decision in *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935 (6th Cir.2009). *Omnicare* was issued after Plaintiffs filed their memorandum in opposition to the motion to dismiss but before Defendants filed their reply brief in support of the motion to dismiss. In their reply brief, Defendants argued that this case was substantially similar to *Omnicare* and that, therefore, Plaintiff's claims should be dismissed for the same reasons. In their proposed sur-reply brief, Plaintiffs argue that *Omnicare* did not set forth any new rules of law and that, in any even, their complaint is distinguishable from the complaint at issue in that case.

Having read the proposed sur-reply brief, the Court generally agrees with Plaintiffs that *Omnicare* does not set forth any new rules of law. However, whether this case is identical to or distinguishable from *Omnicare* is somewhat beside the point. The Court has in fact only relied on *Omnicare* for well-established principles of securities law and none if its rulings have turned on whether this case is on all fours with *Omnicare*. Thus, the parties' analyses of the specific applicability of *Omnicare* to this case are largely inconsequential. Nonetheless, in the interest of granting Plaintiffs a fair opportunity to respond to *Omnicare*, the Court grants leave to file a sur-reply. However, nothing in Plaintiffs' sur-reply alters the Court's rulings on Defendants' motions to dismiss.

**IT IS SO ORDERED.**